788 So.2d 720 (2001)
Wade R. GIBSON
v.
LAKE CHARLES ICE PIRATES.
No. 00 1608-WCA.
Court of Appeal of Louisiana, Third Circuit.
June 6, 2001.
*723 Robert L. Hackett, Attorney at Law, New Orleans, LA, Counsel for Plaintiff/Appellee Wade R. Gibson.
Edward F. Stauss, III, Keogh, Cox & Wilson, Baton Rouge, LA, Counsel for Defendants/Appellants Lake Charles Ice Pirates, Virginia Surety Company.
Court composed of HENRY L. YELVERTON, JIMMIE C. PETERS, and GLENN B. GREMILLION, Judges.
PETERS, Judge.
Wade Gibson, a professional hockey player, was involved in an accident in the course and scope of his employment with the Lake Charles Ice Pirates (Ice Pirates) on January 20, 1998, when he attempted to block a shot in an ice hockey game and was struck with a hockey puck in the area of his left eye. He sustained orbital fractures, facial fractures, cuts, scarring, loss of central vision, and a significant reduction in depth perception. Gibson underwent two surgical procedures in connection with his injuries, one of which involved the installation of titanium plates and screws. The Ice Pirates continued paying Gibson's wages until the end of the hockey season, and, thereafter, the Ice Pirates' compensation carrier, Virginia Surety Company, paid temporary total disability benefits of $333.35 from April 19, 1998, through October 17, 1998.
Gibson filed a claim for compensation, and the matter went to trial on various issues, including Gibson's entitlement to additional indemnity benefits and the defendants' entitlement to a credit/refund. The workers' compensation judge awarded Gibson 100 weeks of permanent partial disability benefits for scarring and disfigurement, 100 weeks of permanent partial disability benefits for loss of vision in his left eye, and temporary total disability benefits at the maximum rate of $350.00 per week "from the date of injury until released to return to work." The workers' compensation judge also awarded the defendants a credit in the amount of $1000.00, representing the amount of profits Gibson's lawn care business netted. The defendants have appealed, contending that the workers' compensation judge erred in (1) failing to find that, pursuant to La.R.S. 23:1081(1)(c), no compensation was due because Gibson failed to use a face shield; (2) failing to find that, pursuant to La.R.S. 23:1208, Gibson forfeited his benefits for giving false statements or representations for the purpose of obtaining workers' compensation benefits; (3) failing to require that, pursuant to La.R.S. 23:1208(D), Gibson make restitution for violating La.R.S. 23:1208 and pay civil penalties; (4) failing to grant them a credit/refund for overpayment of benefits; (5) awarding permanent partial disability benefits under both La.R.S. 23:1221(4)(i) for loss of vision in the left eye and La.R.S. *724 23:1221(4)(p) for scarring and disfigurement; (6) awarding maximum permanent partial disability benefits under La.R.S. 23:1221(4) without deducting the number of weeks of compensation previously paid under La.R.S. 23:1221(1) as temporary total disability benefits; (7) awarding maximum permanent partial disability benefits for a minor scar; (8) awarding permanent partial disability benefits for loss of use of the left eye where appropriate evidence was not submitted to support the award; (9) awarding temporary total disability benefits where Gibson returned to work as a professional hockey player immediately after benefits were terminated; and (10) holding that the maximum compensation rate is applicable in this case.

La.R.S. 23:1081(1)(c) Defense
La.R.S. 23:1081(1)(c) provides that compensation shall not be allowed for an injury caused "by the injured employee's deliberate failure to use an adequate guard or protection against accident provided for him."The defendants contend that the workers' compensation judge was clearly wrong in failing to find that the La.R.S. 23:1081(1)(c) defense applied in this case where Gibson made a deliberate decision not to use a face shield while playing hockey.
A face shield covers the area from the bridge of the nose to the top of the forehead. The parties stipulated that a face shield was made available to Gibson prior to and at the time of his injury and that he did not use the face shield. However, it appears that the parties used the phrase "was made available" to mean "could be obtained" rather than to mean "was on hand." Gibson testified that he was never offered a face shield and that if a player asked for a shield it would have to be ordered. He stated: "When you walk in the dressing room you have your equipment provided. There is a helmet and there is no face shield under it unless you ask for it." Even Robert Loucks, the coach of the Ice Pirates at the time of Gibson's injury, testified that "[o]nce you become a professional, it's optional. It's your choice, and very few players wear them" because they tend to fog up and impair vision. Gibson testified that the face shield is an impediment to his play and that he does not have clear vision through the face shield: "During play it will fog up. If you get chunked in the boards, perspiration or snow or water will splash on the visor, and you know, then you're trying to wipe it off while you're playing. So, it does get in the way. It's bothersome."
The employer has the burden of proving the defense. La.R.S. 23:1081(2). Initially, in light of the liberal construction afforded the employee in workers' compensation law, we do not find that the Ice Pirates proved that the face shield was actually "provided" to Gibson as required by the statute. While the face shield was obtainable through the Ice Pirates by an employee, it was not on hand for immediate use.
Moreover, we find no merit to the defendants' contention that the defense is applicable because the injury would not have occurred if Gibson had been wearing the face shield, which he currently wears while playing. We have declined to hold that a claimant's recovery is barred by his mere failure to use an adequate guard against injury since such a holding would abrogate the rule that ordinary or contributory negligence constitutes no bar to recovery in workers' compensation. See Creel v. Concordia Elec. Coop., Inc., 93-1329 (La.App. 3 Cir. 5/4/94); 640 So.2d 507, writ denied, 94-1423 (La.9/16/94); 642 So.2d 199. Rather, "[t]he defenses of LSA-R.S. 23:1081, strictly construed, relieve employers of liability only for injuries *725 that are intended by individuals or that result from an individual's intoxication, as the latter constitutes no less than a voluntary self-removal from the world of reason." Id. at 508 (citations omitted). In fact, "`[t]he employer must prove that the employee had a willful and wanton intention to injure himself.'" King v. Grand Cove Nursing Home, 93-779, p. 6 (La.App. 3 Cir. 3/9/94); 640 So.2d 348, 352 (quoting Shelvin v. Waste Management, Inc., 580 So.2d 1022, 1027 (La.App. 3 Cir.1991)), writ denied, 94-0865 (La.5/13/94); 641 So.2d 204. The defenses simply do not prohibit an employee's recovery on grounds of contributory negligence, and, in fact, the defenses do not even defeat a claim for injuries resulting from stupidity or foolishness or even recklessness. Creel, 640 So.2d 507. In the instant case, the Ice Pirates did not require the use of the face shield, and the evidence does not support that Gibson's failure to use the face shield was due to a willful and wanton intention to injure himself. Rather, the evidence shows that Gibson's failure to use the face shield was due to the fact that it was an impediment to his job performance. Thus, we find no error in the workers' compensation judge's rejection of the La.R.S. 23:1081(1)(c) defense.

La.R.S. 23:1208 Forfeiture
La.R.S. 23:1208(A) provides in part: "It shall be unlawful for any person, for the purpose of obtaining ... any benefit or payment under the provisions of this Chapter ... to willfully make a false statement or representation." Subsection E provides: "Any employee violating this Section shall, upon determination by [sic] workers' compensation judge, forfeit any right to compensation benefits under this Chapter." "The only requirements for forfeiture of benefits under Section 1208 are that (1) there is a false statement or representation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or defeating any benefit or payment." Resweber v. Haroil Constr. Co., 94-C-2708, 94-C-3138, p. 7 (La.9/5/95); 660 So.2d 7, 12. The workers' compensation judge found that "Gibson made no willful false statement or statements for the purpose of obtaining or defeating any benefits or payment." The defendants contend that Gibson violated La.R.S. 23:1208 in several respects and that, therefore, the workers' compensation judge erred in not ordering a forfeiture of benefits.
Initially, the defendants contend that Gibson lied about the purpose of a Jobst garment prescribed by Dr. Ralph Colpitts, a Lake Charles, Louisiana plastic and reconstructive surgeon. They state in their appellate brief:
Because the plaintiff admitted that he did not follow up with the Jobst garment prescription as requested by Dr. Colpitts, he intentionally misrepresented the purpose of the device due to the fact that it was prescribed as treatment for the very problem which forms the basis of his disfigurement claim in this matter.
The OWC Judge awarded the maximum available benefits for scarring yet the plaintiff did not follow his doctor's orders concerning treatment for that very problem. The claimant attempted to mislead the court as to why he did not get fitted for the Jobst garment because he knew if the court were aware of its true purpose, his claim for scarring in this matter would be adversely affected if not dismissed. Therefore, the purposeful falsification warranted dismissal under Section 1208 of the Act.
Dr. Colpitts testified:
A.... And his scars were healing well. The infraorbital scar was beginning to stick to the orbital rim, and we started him on some Vitamin E and some massage *726 to see if we could prevent it from becoming worse.
HeWade wanted it to respond instantly; and I explained to him, well, this isn't going to respond instantly. We told him one of the things we could do to try and improve the scar is to get it to mature more quickly and we could put him in a Jobst garment, which is a compression garment like a burn patient would wear. And we made the arrangements for him to be measured for it. We also discussed the importance of protecting his good eye.
. . . .
Q. And, again, what's the purpose of this garment?
A. Well, it was an attempt to put some pressure on the scarred area so that we could get it to mature. Because when scars mature, they soften. And as the scars soften, then hopefully it wouldn't retract his lower lid.
The defendants point to the following testimony by Gibson:
Q. Dr. Colpitts gave you a prescription for something called a Jobst garment, is that correct, to help your scar?
A. No, that wasn't for the scar.
Q. Oh, it wasn't?
A. That was for the swelling to get rid of the swelling in the face.
Q. And the swelling had no relationship to the scar?
A. The swelling was in my cheek, not anywhere near my scar. It was from the cheek surgery where they put the plate in my face. It was just to reduce the swelling.
Q. And you never went and picked that up, the Jobst garment, did you?
A. He prescribed it. He didn'the didn't say to use it or not use it. He said, "This might help take down the swelling," and I said, "What about just icing it and stuff normally?" He said, "That will work fine too." He said, "You can get this mask if you want to."
The defendants fault Gibson with the failure to use the Jobst garment and suggest that Gibson attempted to mislead the court about the purpose of the garment because he knew his claim for scarring would have been adversely affected, if not dismissed, if the judge had been aware of the true purpose of the garment. We note that credibility calls are for the trier of fact, Bruno v. Harbert International Inc., 593 So.2d 357 (La.1992), and the workers' compensation judge could have concluded that Gibson, who did not graduate from high school, simply misunderstood the purpose of the Jobst garment and did not make a willful false statement. We find no manifest error in such a determination.
Further, an inadvertent and inconsequential false statement does not result in the forfeiture of benefits. Resweber, 660 So.2d 7. The record reveals that Dr. Colpitts suggested the Jobst garment as an option for the treatment of the scar. Gibson was already religiously following the Vitamin E and massage therapy regime and even took the drastic step of undergoing additional surgery that involved scar excision. In order for any false statement about the purpose of the device to have been even remotely consequential, the defendants would have had to meet a "formidable" burden of proving through clear, convincing, and conclusive evidence that Gibson willfully failed to cooperate with treatment and that this willful failure was the cause of the continuing disability such that the defendants could have interposed the failure as a defense to the payment of benefits. See Louisiana Pac. Corp. v. Allbritton, 00-366 (La.App. 3 Cir. 10/11/00); 773 So.2d 170. There is no evidence in the record to support that Gibson's failure to use the Jobst garment, *727 even if it had been required by Dr. Colpitts rather than presented as an option, was the cause of any continuing disability. The workers' compensation judge had before her Dr. Colpitts' testimony concerning the purpose of the Jobst garment, and she did not deny benefits for the failure to use it nor could she have denied benefits on that basis on the evidence presented. In fact, it appears that the scar for which the Jobst garment was prescribed was not the disfiguring scar for which benefits were claimed but was the scarring from surgery. Thus, any false statement by Gibson about the purpose of the device was inconsequential.
The defendants also contend that Gibson lied or made intentional misrepresentations about certain aspects of his lawn care business and/or earnings from that business. In May of 1998, Gibson began servicing customers in his lawn care business known as Pirates' Lawn Care. The defendants contend that Gibson misrepresented the size of his lawn care business by lying about the number of employees he had in order "to mislead the court into believing that although he was receiving full weekly indemnity benefits at the time, the income generated by the business was not enough to adversely affect his right to the weekly benefits at that time." They point to Gibson's trial testimony on direct examination in which he stated that he "had two or three guys" working for him. He explained: "I had two guys pretty much steady working for me, and a couple of guys came in and out just to help me." However, on cross-examination, Gibson answered in the affirmative when asked whether "ultimately as business grew [he] ended up having five or six employees."
The defendants filed as an exhibit a document entitled "Transaction Detail by Account," which reflects that Gibson paid salary expenses for five individuals other than himself in the lawn care business. One of those individuals received a check frequently, one on several occasions, one on two occasions, and two on one occasion. This corroborates Gibson's testimony that he had two guys "pretty much steady working for" him and others who "came in and out just to help" him. The workers' compensation judge may have found that the slight discrepancy in Gibson's testimony between two individuals who "came in and out just to help" him and the fact that there were actually three such individuals was not a willful misrepresentation but was merely inadvertent, particularly in light of the very limited duration of their help and the length of time between the business's existence and the trial of the matter. In fact, before trial Gibson himself provided the defendants with the "Transaction Detail by Account" document. Had Gibson wilfully intended to make false representations at trial for the purpose of obtaining benefits, it is unlikely that he would have been forthcoming with this document. It is also unlikely that he would have wilfully made false statements about the contents of this document at trial, knowing that the defendants had a copy of the document. We find no manifest error in the workers' compensation judge's rejection of this discrepancy as a basis for forfeiture.
Additionally, the defendants contend that Gibson lied in his deposition when he testified that he did not have any employees in the lawn care business and that he did all of the work himself. Further, they contend that he also misrepresented at trial the extent to which he personally performed the lawn care work in order to explain away his deposition testimony that he had only one customer and no employees in his lawn care business. Also, the defendants contend that Gibson lied in his *728 deposition about the number of customers he had in his lawn care business.
In his deposition, Gibson was asked whether he had any employees or whether he performed all of the work himself. He testified: "I did all of the work myself." Further, Gibson testified in deposition to having only one customer. However, it is clear that the lawn care business did acquire employees at some point and that it did service several customers. Concerning his deposition testimony about the number of customers he serviced, Gibson testified at trial: "My understanding to your question when you asked me was how many did I do. I did one customer." Additionally, Gibson admitted that he testified in deposition that he had performed all of the work for his lawn care business himself but explained that the work was "for that one customer. That was before I hired people." He explained: "When I originally got the first customer I did the work myself and then I got some more work, and then I couldn't do it anymore because it was bothering me, my injury, and I had to have help. I couldn't do it, because when you're using the hand-held trimmer rocks and stuff like that fly up and I didn't want to take a chance, and plus my depth perception, you know. I couldn't judge the grass very well."
The workers' compensation judge made a credibility call and chose to reconcile the seeming discrepancies in favor of Gibson. We find no manifest error in this determination. Gibson gave plausible explanations for his deposition testimony. Additionally, as set forth above, Gibson himself provided the defendants with the "Transaction Detail by Account" document of the lawn care business, which contains a breakdown of the customers that the business serviced as well as the individuals besides Gibson who received wages in connection with the business. This document also reveals that Gibson received only two salary checks and that the issuance of those checks corresponded with the inception of the business, corroborating his testimony that he performed work at the inception of the business and then hired others to help him.
The defendants also contend that Gibson supplied fraudulently inaccurate information on the OWC Form 1020, entitled "Employee's Monthly Report of Earning," for the month of June 1998. Gibson listed gross wages of $1,000.00 on the OWC Form 1020 for June 1998. The defendants assert that Gibson admitted at trial that he underestimated gross earnings on that form by seventy percent.
At trial, Gibson guessed that his lawn care business earned over $1,700.00 for the month of June 1998. He explained that he filled out the OWC Form 1020 quickly and that it contained a rough estimate. However, he also explained that the money he received for that month represented company income before expenses. He testified: "I don't know exactly what I was thinking when I did that. I just didn't fill it out correctly I guess."
The "Transaction Detail by Account" document reveals that the lawn care business invoiced $1,810.00 in June 1998 for services rendered and received payments of $1,760.00 in that month. However, the document also reveals that the lawn care business paid salaries totaling $130.00 for the month, including a payment to Gibson of $80.00, and expenses of over $1,600.00
Importantly, the OWC Form 1020 does not define the term "wages" but asks: "Have you earned any gross wages through self employment in the past 30 days?" We have held that profits from a sole proprietorship should be considered equivalent to wages in the context of workers' compensation cases; however, the *729 term "profits" in that context means the difference between gross income and necessary expenses in operating the business. See Broussard v. Zim's Alignment Serv., Inc., 488 So.2d 395 (La.App. 3 Cir.1986); LaFleur v. Hartford Ins. Co., 449 So.2d 725 (La.App. 3 Cir.1984). Thus, when Gibson listed gross wages of $1,000.00 on the form, he actually overrepresented rather than underrepresented the "wages" that he earned, because that amount did not take into consideration the expenses paid for the month. This overestimation, while inaccurate, actually favored the defendants. Thus, even considering this "inaccuracy" as a misrepresentation, such misrepresentation was not wilfully made for the purpose of obtaining benefits. At worst, it was inadvertent and inconsequential. We find no manifest error in the workers' compensation judge's rejection of this representation as a basis for forfeiture of benefits under La.R.S. 23:1208.
For the same reason, we also reject the defendants' additional contention that Gibson intentionally falsified the total income generated by his lawn care business on the OWC 1020 forms. Even though the amounts Gibson listed on the forms total only $4,950.00 for the period from May 1 through November 2, 1998, whereas the "Transaction Detail by Account" document reflects gross revenues for the business totaling $14,267.00, again, Gibson actually grossly overrepresented the amount of his "wages" because the business's profits totaled only $990.95 and he drew only two salary checks during that six-month period, totaling only $130.00. Importantly, Gibson was not required by the OWC Form 1020 to list the business's gross revenues, and the workers' compensation judge was not clearly wrong in concluding that any representation was inadvertent and inconsequential.
The defendants further assert that Gibson lied at trial about his post-accident wages as a hockey player. Specifically, in November of 1998, Gibson began playing hockey with the Huntsville Channel Cats after the defendants discontinued paying indemnity benefits. At trial, Gibson testified that he signed with the Channel Cats for $350.00 per week. In their appellate brief, the defendants assert: "It is readily apparent that Gibson intentionally falsified his average weekly wage while employed by the Huntsville Channel Cats in the 1998/1999 hockey season was [sic] $350 per week in order to provide the court with factual basis to award SEB benefits, given that his wages while employed by the defendant-employer was [sic] stipulated by the parties to be $500 per week salary [plus] $100 in grocery and gas vouchers."[1]
Initially, the defendants have failed to demonstrate that the $350.00 per week salary amount to which Gibson testified at trial was a false statement or representation. The only evidence the defendants point to as substantiating the falsity of the amount is Gibson's response to a question in his deposition in which he testified that his salary with the Channel Cats was "$600 and an apartment." However, immediately prior to that question, Gibson had just responded to another question that his salary with the Ice Pirates was "equivalent to $600.00 total." The workers' compensation judge could have viewed the $600.00 amount given in connection with the employment with the Channel Cats as being an inadvertent transposition of the salary amount to which he had just testified in connection with his prior employment with the Ice Pirates. Gibson *730 clearly explained in his trial testimony that he did not receive $600.00 a week with the Channel Cats, and the defendants have offered nothing more to contradict that statement other than a statement which could have been nothing more than a slip of the tongue. Without more, we cannot overturn the workers' compensation judge's factual finding that Gibson's trial testimony in that regard did not warrant forfeiture of benefits. Because the workers' compensation judge apparently found that the $600.00 figure to which Gibson testified in deposition was inadvertent rather than willful, we reject the defendants' alternate contention that Gibson lied in his deposition regarding that amount.
In connection with their assignments of error regarding forfeiture, the defendants seek restitution and the assessment of civil penalties under La.R.S. 23:1208(D) against Gibson. We reject this assignment of error because we affirm the trial court's finding that Gibson did not violate La.R.S. 23:1208 for purposes of forfeiture of benefits.

Credit/Refund for Overpayment of Indemnity Benefits
The defendants also contend that the workers' compensation judge was clearly wrong in failing to grant them a credit/refund for the overpayment of indemnity benefits in the amount of $8,667.10, representing the total amount of indemnity benefits paid during the existence of the lawn care business ($333.35 per week × 26 weeks). The workers' compensation judge awarded the defendants a credit of $1,000.00 for "earnings Gibson obtained in the lawn care business." As reflected on the lawn care business's profit and loss sheet, the business netted only $990.95, which is consistent with Gibson's testimony that he pocketed around $1,000.00 from the business.
In support of their position, the defendants point to the business's gross revenues of $14,267.00 as being the basis for the award of a full credit/refund for the period at issue. However, as previously stated, the term "wages," for purposes of workers' compensation benefits in the context of a sole proprietorship, refers to profits, which means the difference between gross income and necessary expenses in operating the business. See Broussard, 488 So.2d 395. Clearly, the defendants are not entitled to a credit/refund of $8,667.20 from the gross revenues of the business.
In any event, the defendants contend that they are entitled to a credit of $3,000.40 based on a pre-injury wage calculation for "seasonal employment" and based on the deletion of "non-taxable items" from the calculation of the average weekly wage, i.e., the value of grocery and gas coupons and the value of apartment rent. Gibson testified to a twenty-sixweek pay period plus an eight-week play-off period. The parties stipulated that the Ice Pirates paid Gibson a salary in the amount of $500.00 per week plus $100.00 per week in grocery and gas vouchers. Additionally, the parties stipulated that the Ice Pirates provided Gibson with an apartment valued at $750.00 per month from the date of hire in October of 1997 through September of 1998. They further stipulated that Gibson was paid weekly indemnity benefits in the amount of $333.35.
Pursuant to La.R.S. 23:1021(10)(a)(v)(aa), an employee's average weekly wage is determined by dividing his annual income by fifty-two if he is engaged in seasonal employment, which is defined as "employment customarily operating only during regularly recurring periods of less than forty-four weeks annually." The defendants state in their appellate brief: "Gibson's pre-accident average *731 weekly wage was $326.92 per week at the most ($500 per week × 34 weeks equals $17,000 [divided by] 52 = 326.923). The corresponding weekly indemnity rate should have been $217.95 (66 2/3% of $326[.]92). Therefore, Gibson was overpaid $3,000.40 in indemnity benefits ($333.35 paid per week minus $217.95 correct rate = $115.40 × 26 weeks)."
The defendants apparently do not contend that it is per se improper to include the value of grocery and gas vouchers and apartment rent in calculating Gibson's wages. In fact, in Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007-08 (La. 1989), the supreme court stated:
In determining the amount of pre-injury wages an employee earned, "[a]ny money paid the employee which can be regarded as remuneration or reward for his services should be included in fixing his compensation, irrespective of whether or not the payment was in the form of wages." Malone and Johnson, 14 Louisiana Civil Law Treatise, Workers' Compensation § 324 at 93 (1980).
Additionally, this court has approved the inclusion of the value of housing in calculating an employee's wages. See Vaughan v. Insurance Co. of North America, 482 So.2d 1014 (La.App. 3 Cir.1986); Hall v. Joiner, 324 So.2d 884 (La.App. 3 Cir.1975).
Rather, as we appreciate the defendants' position, the value of the grocery and gas vouchers and the value of the apartment rent should not be included in calculating Gibson's pre-accident wages because he could not verify that he actually reported the value of those items as income for federal income tax purposes and, under La.R.S. 23:1021 (10)(f), nontaxable items may not be included in determining the employee's pre-accident wages. La.R.S. 23:1021(10)(f) does provide that "no amount shall be included for any benefit or form of compensation which is not taxable to an employee for federal income tax purposes" in determining the average weekly wage. However, this Subsection was added by Acts 1999, No. 751, § 1, and this court has determined that it is not retroactive. See McClain v. Pinecrest Dev. Ctr., 00-1622 (La.App. 3 Cir. 2/28/01); 779 So.2d 1112. Even if it were retroactive and applicable to this case, La.R.S. 23:1021(10)(f) addresses items which are not "taxable," not those taxable items which the employee failed to include on his income tax return. The defendants do not even argue that the items in question are not "taxable." Thus, we reject the defendants' assignment of error regarding a credit/refund.

Permanent Partial Disability Benefits
The workers' compensation judge awarded Gibson 100 weeks of disability benefits for loss of vision in his left eye pursuant to La.R.S. 23:1221(4)(i) and 100 weeks of disability benefits for scarring and disfigurement pursuant to La.R.S. 23:1221(4)(p). The defendants contend that the workers' compensation judge erred in awarding disability benefits under La.R.S. 23:1221(4)(p) where permanent partial disability benefits were also awarded under La.R.S. 23:1221(4)(i).
La.R.S. 23:1221(4) provides in part:
In the following cases, compensation shall be solely for anatomical loss of use or amputation and shall be as follows:
. . . .
(i) For the loss of an eye, sixty-six and two-thirds percent of wages during one hundred weeks.
. . . .
(p) In cases not falling within any of the provisions already made, where the employee is seriously and permanently disfigured ... compensation not to exceed sixty-six and two-thirds percent of *732 wages for a period not to exceed one hundred weeks may be awarded.
(Emphasis added.)
In Jack v. Fidelity & Casualty Co. of New York, 326 So.2d 584, 586 (La.App. 3 Cir.), writ denied, 330 So.2d 295 (La.1976), this appellate court explained: "It is well settled that no award can be made for disfigurement or impairment of a physical function ... where either the disability provisions or the specific injury schedule applies." However, in Jack, the claimant was attempting to recover benefits for the loss of the function of his toe under both La.R.S. 23:1221(4)(c) and (p). The court in Bourgeois v. Houma General Painting & Waterproofing Co., 515 So.2d 486, 489 (La. App. 1 Cir.1987), distinguished Jack, stating:
In the case before us, Plaintiff is not seeking to recover for the partial disability of his foot under LSA-R.S. 23:1221(4)(g) and (p). This "double dipping" is clearly barred. Rather, Plaintiff is seeking to recover for the disability of his foot under (g)one loss of functionand he also seeks to recover for the loss of his four teeth and his facial scars under (p) as a separate, entirely independent loss of function. Under the statute, Plaintiff is entitled to recover for both of these losses of functions.
In the instant case, Gibson is not seeking to recover for the loss of use of his left eye under both La.R.S. 23:1221(4)(i) and (p); rather, he is seeking to recover for the loss of use of his left eye under La.R.S. 23:1221(4)(i) and for the scarring and disfigurement of his face under La. R.S. 23:1221(4)(p). This is not a situation of "double dipping" but of separate recovery for separate conditions. Therefore, we find no error in the workers' compensation judge's determination that Gibson was entitled to separate awards of benefits for each condition.
In any event, the defendants contend that the workers' compensation judge erred in awarding maximum benefits under La.R.S. 23:1221(4)(i) for anatomical loss of use of the left eye because there was no evidence supporting that award.
La.R.S. 23:1221(4)(q) provided at the time of Gibson's accident:
No benefits shall be awarded or payable in this Paragraph unless anatomical loss of use or amputation, as provided in Subparagraphs (a) through (o) of this Paragraph or loss of physical function as provided in Subparagraph (p) or (s) of this Paragraph is greater than twenty-five percent as established in the American Medical Association "Guides to the Evaluation of Permanent Impairment", copyright 1984, by the American Medical Association.
It is the defendants' contention that Gibson neither lost his left eye entirely nor lost all anatomical use of the eye. Further, they contend that Gibson submitted no evidence at trial addressing the anatomical loss of use or physical function as established in the American Medical Association guidelines.
Dr. Frank Culotta, Jr., a Lafayette, Louisiana ophthalmologist, reported that Gibson sustained a loss of central vision in his left eye as well as a significant reduction in depth perception. He stated: "Mr. Gibson has vision beyond the level of legal blindness in the left eye. I anticipate that this will be a permanent change. He has loss of depth perception, which will affect his ability to play ice hockey at a competitive level. As I explained to him, his depth perception may improve over the next 6 to 12 months, but I doubt that it will improve enough where he will be capable of competing at his previous level." However, Dr. Culotta did not give the *733 exact percentage of loss of use as established in the American Medical Association guidelines.
In Durbin v. State Farm Fire & Casualty Co., 558 So.2d 1257 (La.App. 1 Cir. 1990), the claimant's physician assigned a disability rating to the claimant's left knee, but the disability rating was not based on the American Medical Association guidelines. The first circuit, therefore, held that the trial court erred in finding the claimant permanently partially disabled. However, the first circuit remanded the case to the trial court for the taking of additional evidence on the extent of the claimant's disability under the American Medical Association guidelines.
While we find the evidence overwhelming that Gibson lost substantial vision, we must give deference to the statutory mandate that the percentage of loss be established in accordance with the American Medical Association guidelines. In applying the statute, we are constrained to find that the workers' compensation judge erred in awarding maximum benefits under La.R.S. 23:1221(4)(i) without evidence of the extent of the disability as established in the American Medical Association guidelines. Thus, we remand this matter to the Office of Workers' Compensation for the taking of additional evidence to establish the percentage of loss according to those guidelines.
The defendants also contend that the workers' compensation judge erred in awarding maximum benefits for "a very minor scar to a professional hockey player where such scars are considered a `badge of honor' in the profession." As set forth above, an employee is entitled to benefits under La.R.S. 23:1221(4)(p) where he is seriously and permanently disfigured.
In Creel v. Concordia Electric Cooperative, Inc., 95-914, pp. 11-12 (La.App. 3 Cir. 1/31/96); 670 So.2d 406, 412, writ denied, 96-577 (La.4/19/96); 671 So.2d 923, we stated:
This court in Broadway v. Cade Wood, Inc., 583 So.2d 153, 154-155 (La. App. 3 Cir.[), writ denied, 588 So.2d 106 (La.] 1991) defined disfigurement:
La.R.S. 23:1221(4)(p) specifically provides that compensation is allowed only for serious and permanent disfigurement. The Louisiana worker's compensation act does not define the term "disfigurement" nor has our research of Louisiana jurisprudence revealed any case defining the term "disfigurement". The term "disfigurement" has been defined in other jurisdictions as "that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner". Superior Mining Co. v. Industrial Commission, 309 Ill. 339, 141 N.E. 165 (Ill.1923). A serious disfigurement is a disfigurement "of such a character that it substantially detracts from the appearance of the person disfigured". Dombrowski v. Fafnir Bearing Co., 148 Conn. 87, 167 A.2d 458 (Sup.Ct.Err.1961).
The determination of whether an injury is disfiguring is factual. Therefore, the hearing officer's finding on this point will not be disturbed absent manifest error.
In the instant case, the record reveals that Gibson sustained facial scarring in the area of his left eye as well as a disfiguring bulge of the left eye. The workers' compensation judge had the opportunity to view the disfigurement first hand, and we find no manifest error in her determination that Gibson was seriously and permanently disfigured.
*734 The defendants also contend that the workers' compensation judge erred in awarding maximum benefits without deducting the number of weeks of compensation previously paid under La.R.S. 23:1221(1) as temporary total disability benefits. La.R.S. 23:1223 provides in pertinent part:[2]
A. Except as provided in R.S. 23:1221(4)(s), when compensation has been paid under R.S. 23:1221(1), (2), or (3), the number of weeks of compensation paid shall be deducted from the number of weeks of compensation allowed under R.S. 23:1221(4) or Subpart C of this Part.
The defendants paid Gibson temporary total disability benefits in the amount of $333.35 from April 19, 1998, through October 17, 1998, or for twenty-six weeks. The workers' compensation judge erred in failing to deduct the number of weeks of compensation paid from the number of weeks of compensation awarded under La.R.S. 23:1221(4)(p) for the disfigurement. Therefore, we amend the judgment to reduce the 100-week award of compensation for disfigurement by twenty-six weeks.

Temporary Total Disability Benefits
The workers' compensation judge awarded Gibson temporary total disability benefits "from the date of injury until released to return to work at the maximum compensation rate of $350.00 per week as stipulated by the parties."[3] The defendants assert that, while the $333.35 per week initially paid to Gibson between hockey seasons was proper, the workers' compensation judge was clearly wrong in holding that the maximum rate of $350.00 is the proper amount. The $350.00 rate reflects the inclusion of the grocery and gas vouchers and/or apartment rent as wages. We have previously found no error in the inclusion of those amounts, and, therefore, we affirm the maximum compensation rate of $350.00.
The defendants also contend that the workers' compensation judge erred in awarding additional temporary total disability benefits after the initial twenty-six weeks, where Gibson returned to work as a professional hockey player immediately after indemnity benefits were terminated. Gibson testified that after his injury and release by physicians he returned to playing professional hockey with the Huntsville Channel Cats and subsequently with the San Antonio Iguanas. We have found no evidence to support that Gibson was at that time or is currently temporarily totally disabled. Therefore, the workers' compensation judge was clearly wrong to the extent that she awarded additional benefits in that regard, and we reverse that award.

Supplemental Earnings Benefits
If an employee sustains a work injury that results in his inability to earn ninety percent or more of his average pre-injury wages, he is entitled to receive supplemental earnings benefits. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97); 696 So.2d 551. Initially, the employee bears the burden of proving that the injury has resulted in his inability to earn that amount under the particular facts and circumstances of the case. Id.
*735 At the time of trial, Gibson was unemployed, apparently having just completed the hockey season with the San Antonio Iguanas. There is medical evidence in the record to support that his injury will affect his ability to play hockey, but Gibson has gone on to play for two additional hockey teams, one of which progressed to the playoffs and ultimately won the championship. There is also evidence in the record that he earned less income with the two teams with which he played following his injury. However, the record does not support that Gibson met his burden of proving that his injury rather than some other circumstance or factor resulted in the lower pay. He simply failed to offer evidence sufficient to connect the lower rate of pay with his injury. Therefore, he is not entitled to supplemental earnings benefits.

DISPOSITION
For the foregoing reasons, we amend the judgment to reduce the award for permanent partial disability benefits from 100 weeks to seventy-four weeks. We reverse the award for permanent partial disability benefits under La.R.S. 23:1221(4)(i) and remand the case for the taking of additional evidence on the extent of the loss of use of the eye under the American Medical Association guidelines. We also reverse the award of additional temporary total disability benefits and reject an award for supplemental earnings benefits. We affirm the judgment in all other respects and assess costs of this appeal to the defendants.
AMENDED IN PART; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NOTES
[1] The parties stipulated at trial that the Ice Pirates had provided Gibson with an apartment, $500 per week in salary, and $100 per week in grocery and gas vouchers.
[2] We have set forth the version of the statute as it now appears following its amendment by Acts 1999, No. 126, § 1. We have done so because we have previously found this amendment to be retroactive. See Manpower Temporary Servs. v. Lemoine, 99-636 (La.App. 3 Cir. 10/20/99); 747 So.2d 153.
[3] The parties stipulated that the maximum compensation rate allowable at the time of the injury was $350.00.