# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 07-1028


WADE GIBSON, ET UX

VERUS

DR. JOHN A. DIGIGLIA, III, ET AL.


**\*\*\*\*\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, DOCKET NO. 2000-6647
HONORABLE RICK BRYANT, DISTRICT JUDGE


**\*\*\*\*\*\*\*\*\*\*\*\*\***
**SYLVIA R. COOKS**
**JUDGE**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Jimmie C. Peters, Judges.


**AFFIRMED.**


**Robert L. Hackett**
**The Hackett Law Firm**
**3817 Paces Ferry West, S.E.**
**Atlanta, Georgia 30339-4140**
**(770) 333-6276**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Wade Gibson, et ux.**


**John E. Bergstedt**
**The Bergstedt Law Firm**
**One Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana 70629**
**(337) 438-2325**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Dr. John A. Digiglia, III, et al.**

**COOKS, Judge.**

## STATEMENT OF THE CASE

This is a medical malpractice case. Wade R. Gibson, a professional ice hockey player, sued Dr. John A. Digiglia, III for damages stemming from the loss of his central vision and a significant reduction in depth perception in his left eye.[1] At the close of Mr. Gibson's case, the trial court directed a verdict in favor of Dr. Digiglia. Mr. Gibson appeals. For the reasons assigned below, we affirm the judgment of the trial court.

## STATEMENT OF THE FACTS

At the time of the accident, Wade R. Gibson was a twenty-four year old professional ice hockey player with the Lake Charles Ice Pirates. The Ice Pirates are part of the Western Professional Hockey League. Dr. John A. Digiglia, III is the medical director for the Ice Pirates and owns a small financial interest in the team. On the evening of January 20, 1998, the Ice Pirates were playing in an away game in San Angelo, Texas. During the game, Mr. Gibson was struck on the left side of his face with a hockey puck. He was immediately taken to a hospital in San Angelo, Texas and treated by the emergency room physician, Dr. Samuel Kasberg. The emergency room physician requested a consult with a surgeon and an ophthalmologist. Dr. Grady Bryan, an oral maxillofacial surgeon, responded to the call and admitted Mr. Gibson to the hospital for testing and evaluation. A CT scan of Mr. Gibson's face confirmed a diagnosis of a left malar fracture and a retinal hemorrhage. Dr. Bryan testified the following day he spoke to the team physician to report the extent of the injuries and discuss transferring Mr. Gibson to Lake Charles

_____

[1] Mr. Gibson's claim for workers' compensation has been on appeal before this court. *See Gibson v. Lake Charles Ice Pirates*, 00-1608 (La.App. 3 Cir. 6/6/01), 788 So.2d 720, *writ denied*, 01-2004 (La. 10/26/01), 799 So.2d 1155.

for medical treatment.

Dr. Digiglia testified he was called by the hockey coach about 11:00 the night of the accident and told Mr. Gibson was injured during the game. He understood Mr. Gibson was taken to a hospital in San Angelo and one of the doctors would call the next morning to let him know the extent of Mr. Gibson's injuries. The next morning Dr. Bryan called and reported Mr. Gibson had sustained a fracture on the left side of his face and a retinal hemorrhage. Dr. Digiglia testified:

> He told me that as far as his fracture was concerned that it was something that could be fixed now or it could be fixed within seven to ten days, that some doctor – some surgeon would like to wait until the swelling goes down before they fix that fracture. I asked him about were there any other injuries; he said he talked to an ophthalmologist that was seen there that night, that they spoke in the ER and that he had some retinal hemorrhage, and I asked him what about his eye and he said that the ophthalmologist told him that his eye was stable and that if he wanted to be transferred he could be transferred.

Dr. Bryan testified he spoke to Dr. John Barnes, an ophthalmologist, regarding Mr. Gibson's condition:

> At the time that I spoke to him, Dr. Barnes had arrived prior to my arrival. In fact, he was completing his examination at the time that I showed up, and he basically just gave me a brief overview of what he had seen on his examination, and indicated that he thought there might be some injury to the retina but I don't recall exactly, you know, his specific words on four years ago; but I remember he said, you know, that he was a little bit concerned of some possibility of that type of an injury.

The hospital chart reflects the following: "A complete ophthalmologic examination has been performed by Dr. Barnes and remainder of his physical examination is unremarkable. Dr. Barnes is to reexamine the patient's eye in the morning." Despite Dr. Bryan's testimony and the chart notes, Dr. Barnes denies a complete ophthalmologic examination took place. Dr. Barnes testified he went to the hospital the day after the accident and found Mr. Gibson had already left for the airport. Dr. Barnes's chart notes of January 21st reflect that the patient had been

2

discharged prior to his having performed a dilated eye exam. Dr. Barnes testified he drove to the airport and advised Mr. Gibson to see an ophthalmologist in Lake Charles. Mr. Gibson confirms that he spoke to Dr. Barnes at the airport. Mr. Gibson's transfer was arranged by the Western Professional Hockey League and he was placed on a commercial flight to Lake Charles the day after the accident. Mr. Gibson suffered a significant loss of depth perception and central vision in his left eye which he attributes to a delay in medical treatment coupled with the change in air pressure on the flight home.

## LAW AND DISCUSSION

At the close of Plaintiffs' case, the trial court granted Dr. Digiglia's motion for a directed verdict under La.Code Civ.P. art. 1810. A directed verdict is appropriately granted in the event that the "facts and inferences are so overwhelming in favor of the moving party that the court finds that reasonable men could not arrive at a contrary verdict." *Guste v. Nicholls Coll. Found.,* 564 So.2d 682, 689 (La.1990). On review, "an appellate court also considers whether the evidence submitted indicates that reasonable triers of fact would be unable to reach a different verdict." *McNabb v. Louisiana Medical Mutual Insurance*, 03-0565 (La.App. 3 Cir. 11/5/03), 858 So.2d 808, 816-17. "However, if there is substantial evidence opposed to the motion, that is, evidence of such a quality and weight that reasonable and fair-minded men exercising impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury." *Belle Pass Terminal, Inc. v. Jolin, Inc.*, 92-1544/1545 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, *478, writ denied*, 94-0906 (La. 6/17/94), 638 So.2d 1094. On review, an appellate court considers the evidence under the substantive law applicable to the nonmoving party's claim. *Frazier v. Zapata Protein USA, Inc.*, 02-0605 (La.App. 3 Cir. 12/11/02), 832

3

So.2d 1141, *writ denied*, 03-0145 (La. 3/21/03), 840 So.2d 537, *writ denied*, 03-0126 (La.3/21/03), 840 So.2d 539.

The substantive law applicable to Mr. Gibson's claim for medical malpractice is found in La.R.S. 9:2794(A) which provides, in relevant part:

> In a medical malpractice case, the plaintiff has the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular medical specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden or proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to sue reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have occurred.

Plaintiffs assert Dr. Digiglia, as the team physician, fell below the standard of care in authorizing Mr. Gibson's transfer to Lake Charles knowing of his retinal hemorrhage. In response, Dr. Digiglia contends his decision to transfer Mr. Gibson was based on assurances made by Dr. Bryan that Mr. Gibson was stable and there were no contraindications for air travel to Lake Charles. Dr. Bryan was the admitting and discharging physician and the physician in San Angelo primarily responsible for Mr. Gibson's care and treatment. Dr. Digiglia asserts he was entitled to rely on the representations made by Dr. Bryan and Plaintiffs presented no evidence to establish his actions fell below the standard of care of a team physician.

In support of their claim, Plaintiffs presented the testimony of Dr. David

4

Newsome, an ophthalmologist. Dr. Newsome did not testify regarding whether Dr. Digiglia reliance on the treating physician's representations fell below the standard of care. Instead, Dr. Newsome's testimony focused entirely on the treatment Mr. Gibson received in San Angelo and the actions of Dr. Bryan in releasing Mr. Gibson for air travel. Dr. Newsome testified "at a minimum . . . imaging studies and a thorough eye examination, which could be done right there in the emergency room, would be helpful in making a decision as to the advisability of moving Mr. Gibson by air or any other means." He opined the absence of adequate diagnostic testing and the delay in the administration of medical treatment, combined with the change in air pressure, contributed to the loss of central vision and depth perception in the left eye. Dr. Newsome stated:

> In San Angelo, Mr. Gibson never received the necessary standard of care type evaluation of his eyes, which would include a complete dilated eye examination to assess the level of injury, to assess whether there was active bleeding, retinal detachment, and so forth, and he was never given any kind of appropriate diagnostic testing of the eye. Therefore, he was transported by air without having the full knowledge of exactly what had happened to the injured eye. The problem with air transport in this type of eye injury, where bleeding and swelling can be major causes of damage to the tissue, is that commercial airliners and others are not pressurized to sea level, but only to around 5,000 feet or so. Therefore, there is a reduction in pressure to exacerbate, make a lot worse, bleeding and swelling in the eye tissues.

Dr. Newsome did not testify regarding whether Dr. Digiglia's reliance on the statements made by Dr. Bryan, that the necessary diagnostic tests were performed on the eye and the treating ophthalmologist had cleared Mr. Gibson for travel to Lake Charles, fell below the standard of care. [2]

Dr. Bryan testified he consulted with Dr. Barnes, an ophthalmologist,

---

[2] We note, as well, Dr. Newsome's testimony that Mr. Gibson's eye injury was exacerbated by air travel was refuted by Dr. Barnes, the ophthalmologist. Although Dr. Barnes denied that he examined Mr. Gibson, he stated air travel was not contraindicated for a retinal hemorrhage. Significantly, he stated: "I would not have advised him against air travel" but would "tell him to see a retinal specialist when he got to Lake Charles."

regarding Mr. Gibson's eye injury. The hospital chart reflects the following: "A complete ophthalmologic examination has been performed by Dr. Barnes and remainder of his physical examination is unremarkable. Dr. Barnes is to reexamine the patient's eye in the morning." Testifying regarding the conversation with Dr. Digiglia, Dr. Bryan stated: "I was given the indication that it was desired for him to go back to Lake Charles, which they asked me if that was okay by me and I said there wasn't any contraindication from my standpoint, and then I did – I did want to make sure that Dr. Barnes had had an opportunity to see him once again." Dr. Barnes did see Mr. Gibson at the airport the next morning and Dr. Bryan assumed "he was examined later that morning once again prior to dismissal." The emergency room physician's report of January 20 states: "We have consulted with Dr. Barnes and Dr. Grady Bryan, who are both in to evaluate the patient." Dr. Digiglia testified he relied on Dr. Bryan's assurance that Dr. Barnes had examined Mr. Gibson and had no problem with the transfer.

> I asked him [Dr. Bryan] about were there any other injuries; he said he talked to an ophthalmologist that was seen there that night, that they spoke in the ER and that he had some retinal hemorrhage, and I asked him what about his eye and he said that the ophthalmologist told him that his eye was stable and that if he wanted to be transferred he could be transferred.

The Plaintiffs assert Dr. Digiglia had a duty as the team physician to obtain Mr. Gibson's test results and medical reports to confirm the accuracy of the medical information he received from Dr. Bryan before allowing the transfer of Mr. Gibson by air to Lake Charles. Plaintiffs assert medical clearance to travel should have come from Dr. Digiglia, the primary care physician, and not from Dr. Bryan, a surgeon. Further, Plaintiffs assert Dr. Digiglia should have consulted directly with Dr. Barnes, the ophthalmologist. Plaintiffs argue the team physician has a duty to check on the competency of other physicians and the accuracy of the information supplied by them.

6

They assert Dr. Digiglia fell below the standard of care in relying solely on information given to him by the treating physicians in San Angelo. However, Plaintiffs have presented no evidence to establish the standard of care required of a "team medical director/coordinator" nor have they presented any evidence to support a claim that Dr. Digiglia's actions fell below the standard of care for that alleged sub-specialty of physicians.

Dr. Digiglia testified as the medical director/coordinator for the Ice Pirates, his responsibilities include performing physicals and treating minor injuries and illnesses. He was only one of a team of physicians, which included orthopedic surgeons, ophthalmologists, neurologists and neurosurgeons, who were responsible for the care of the players. Dr. Digiglia testified he was not going to assume the care for Mr. Gibson when he arrived in Lake Charles, a fact he made clear to Dr. Bryan: Dr. Digiglia testified: "He [Dr. Bryan] knew I was a family practice doctor and that I wouldn't be taking care of his further injuries. I told him that we would have to get ophthalmology to look at him, and a facial surgeon to look at him."

We have reviewed the record under the substantive law and find Plaintiffs failed to present an expert witness to testify Dr. Digiglia had a duty to confirm the accuracy of the medical information he received from the treating physicians in San Angelo or that he fell below the applicable standard of care in relying on the assurances that Mr. Gibson was able to travel by air. The record does not contain any other evidence which could lead reasonable, fair-minded jurors to conclude Dr. Digiglia was negligent in his treatment of Mr. Gibson. Accordingly, we affirm the decision of the trial court directing a verdict in favor of Dr. Digiglia.

7

**DECREE**

Based on our review of the record, we affirm the judgment of the trial court directing a verdict in favor of Dr. Digiglia.  All costs of this appeal are assessed to Wade Gibson.

**AFFIRMED.**