978 So.2d 576 (2008)
Mickel BRIEN, Plaintiff-Appellee
v.
LEON ANGEL CONSTRUCTORS, INC., and Bridgefield Casualty Insurance Company, Defendant-Appellant.
No. 42,904-WCA.
Court of Appeal of Louisiana, Second Circuit.
March 12, 2008.
*578 The Smith Law Office, L.L.C., by Linda Lea Smith, Eskridge E. Smith, Jr., Bossier City, for Appellant.
Fischer & McMahon, by Mark Kenneth Manno, for Appellee.
Before CARAWAY, PEATROSS and DREW, JJ.
DREW, J.
In this workers' compensation case, defendants have appealed a judgment awarding supplemental earnings benefits and ordering defendants to pay a penalty and attorney fees to the claimant. The claimant has answered the appeal, seeking to increase amounts for the penalty and attorney fees, as well as seeking an award of attorney fees for defending this appeal.
We affirm the judgment and award additional attorney fees.

FACTS
Mickel Brien began working as a carpenter for Leon Angel Constructors in November of 2001 on the renovation of the DeSoto Parish courthouse. Originally from Houma, Brien had moved to Mansfield to take the job, and he lived on the construction site in his camper. Most of his job responsibilities involved installing drywall and acoustical ceiling tiles. Brien alleged that he was injured on June 24, 2002, while he and several co-workers moved a large cabinet. When another worker released one end of the cabinet as it was being lowered, Brien had to bear too much of the cabinet's weight and he felt a snap in his lower back.
Brien continued working the day that he sustained his injury. He claimed that as his pain worsened, he reported his injury to his supervisor, Randall O' Neal. Brien missed several days of work, then returned to full-time status.
Despite his injury, Brien did not seek medical treatment until two months later, when he was brought to DeSoto Regional Hospital on the afternoon of August 26, 2002. Dr. Donald Taylor examined Brien on September 4, 2002.[1] Dr. Taylor's diagnosis was myoligamentous strain to the lower back with possible lumbar disc involvement.
An MRI of Brien's lumbar spine was done on September 16, 2002. The only disc abnormality noted by the radiologist was generalized disc bulging causing extra-dural defect on the thecal sac at L4-5.
Brien was fired on September 16, 2002, and he began receiving weekly indemnity benefits of $346.68 that month.
Dr. Carl Goodman, an orthopedic surgeon, began treating Brien on September 19, 2002. His impressions were lumbar *579 strain and sprain, and degenerative lumbar disc disease with acute disc bulge.[2] Physical therapy was recommended by Dr. Goodman, and he continued to recommend it after he treated Brien on November 5 and December 12. Dr. Goodman limited Brien to light duty work.
When Dr. Goodman examined Brien on January 22, 2003, his impressions were again lumbar strain and sprain and degenerative lumbar disc disease. Dr. Goodman believed that Brien had reached maximum medical improvement, but that he could only engage in light work activity. It was noted by Dr. Goodman that Brien wanted to see a neurosurgeon, but the doctor did not think this was necessary. However, later, in response to a March 3, 2003, letter from a nurse case manager, Dr. Goodman answered "No" when asked if he thought Brien was still at maximum medical improvement, and answered "Yes" when asked if he thought that it was medically necessary for Brien to follow up with a neurosurgeon. Dr. Goodman referred Brien to Dr. David Cavanaugh for a neurosurgical consultation, but after reviewing Brien's records, Dr. Cavanaugh declined to see him.
In early April of 2003, Dr. Goodman noted that he did not think that pain management would provide any lasting results. But Dr. Taylor referred Brien to pain management on April 16, 2003. The next month, Dr. Goodman himself referred Brien to pain management with Dr. William Whyte.
Dr. Whyte met with Brien for the first time on June 10, 2003. Dr. Whyte's impressions on this first visit were degenerative lumbar disc disease, very mild broad base disc protrusion that was not significant, and muscular spastic pain. Brien subsequently underwent three spinal treatments. Dr. Whyte thought on August 4, 2003, that Brien had reached maximum medical improvement. Evaluating Brien later that month, Dr. Whyte thought that Brien was possibly addicted to pain killers because his physical exam was unchanged from his earlier visit.
A Functional Capacity Examination ("FCE") performed on Brien in May of 2003 showed that Brien could work full time in a job that required light-medium physical demand. Dr. Austin Gleason performed an independent medical examination in September of 2003. Dr. Gleason concluded that Brien was at maximum medical improvement and had a 5% impairment to the total body from degenerative and symptomatic disc disease at L4-5. Dr. Gleason noted that the FCE showed Brien could return to work at a light-medium level, but that he had limited transferable skills other than construction and carpentry.
Dr. Whyte's office evaluated Brien for the last time on January 21, 2004, when Brien told Dr. Whyte's physician's assistant that he still had lower back pain and that he disagreed with the FCE that he could perform light duty work. Dr. Goodman examined Brien for the last time on June 29, 2004, when his impressions were mild midline disc protrusion at L4-5, and lumbar strain and sprain with persistent pain. Dr. Goodman told Brien to take over-the-counter medications as needed, and he again released Brien to light-medium to light work on a permanent basis.
Brien filed a claim for compensation in March of 2004 in which he asserted that he had not been provided with meaningful vocational rehabilitation, and was entitled to weekly indemnity benefits, medical treatment, penalties, and attorney fees.
*580 In June of 2004, Dr. Whyte approved a sales job at Ivey Lumber in Mansfield. Dr. Goodman also approved the Ivey Lumber job. In October of 2004, Dr. Whyte approved a cashier position at a Wal-Mart in Mansfield. Dr. Goodman approved the Wal-Mart job the next month.
On November 16, 2004, the adjuster handling Brien's claim terminated the payment of indemnity benefits. Subsequently, numerous pleadings were filed by both sides, including a claim by defendants that Brien had violated La. R.S. 23:1208 by making misrepresentations and false statements.
Following a trial on the merits, the Workers' Compensation Judge ("WCJ") found that: (1) Brien sustained a compensable injury to his lower back on June 24, 2002; (2) Brien can work at a light to medium work level that does not involve repeated bending and twisting, and these limitations prevent him from returning to his pre-injury job; (3) modified duty jobs offered in Leesville or Shreveport by Angel Constructors do not meet the Banks v. Industrial Roofing & Sheet Metal Works, Inc., requirement that a suitable job be in Brien's community or reasonable geographic region; (4) Brien was unable to earn at least 90% of his pre-injury wages and was entitled to supplemental earnings benefits of $872.47 per month from November 16, 2004, to October 16, 2006; (5) Brien was entitled to attorney fees of $7,500.00 and penalties of $2,000.00 for the wrongful termination of indemnity benefits in November of 2004; and (6) Brien had not violated La. R.S. 23:1208.

DISCUSSION
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Id. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed even though the appellate court may feel that its own inferences and evaluations are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
Compensable Injury
An employee is entitled to receive workers' compensation benefits for personal injuries from an accident arising out of and in the course of his employment. La. R.S. 23:1031(A). An accident within the context of workers' compensation is defined as an "actual, identifiable, precipitous event happening suddenly or violently . . . and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La. R.S. 23:1021(1).
A plaintiff in a workers' compensation action has the burden of establishing a work-related accident by a preponderance of the evidence. Player v. International Paper Co., 39,254 (La.App. 2d Cir.1/28/05), 892 So.2d 781. If the evidence is evenly balanced or shows only some possibility that a work-related event produced the disability or leaves the question open to speculation or conjecture, then the plaintiff fails to carry the burden of proof. Player, supra. Whether *581 the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the hearing officer. Lewis v. Chateau D'Arbonne Nurse Care Center, 38,394 (La.App. 2d Cir.4/7/04), 870 So.2d 515.
Appellants first contend that the WCJ was clearly wrong in concluding that Brien had suffered a disabling injury while at work on June 24, 2002. The issue is not whether Brien was injured, as his medical records reveal that Brien had, among other back problems, muscle sprain and strain in his lower back. Rather, the issue is whether he sustained this injury while working. Appellants argue that because Brien did not seek medical attention until after he returned from a trip to Houma, he sustained his injury during this trip and not while working.
Angel Constructors' payroll records show that Brien continued working on the day of his accident, as he worked overtime until the early evening. Brien left work after a few hours on Tuesday, June 25, and then he was off work over the next three days, because of his back injury.[3] Brien was paid a full week's worth of wages despite missing work for most of that week.[4] Brien missed work the following Monday and Tuesday, July 1 and 2, but he was not compensated for this personal leave. Brien denied missing those two days for personal reasons.
Brien testified that he remained in his camper for eight days before returning to work. This is largely consistent with the payroll records, which show Brien as being away from work for seven full days, including the weekend. Brien denied that he worked on July 3 and 4, despite the payroll records showing the contrary. Brien did not work on Friday, July 5, but the reason for his absence was not indicated in the payroll records.
Brien began working normal 40-hour weeks beginning on Monday, July 8, but he claimed that he was allowed to work at his own pace, and that he continued to work at his own pace until he stopped working for Angel Constructors. It was explained by Brien that what he meant by working at his own pace was that he could sit down when he felt he needed to take a break. Brien stated that he continued to work full-time after his injury because he had to earn a living.
Brien worked 30 minutes on Friday, August 23, then left for Houma. He returned to work on August 25, when he put in six hours. Brien went to the emergency room at DeSoto Parish Hospital the next day. The history that Brien gave at the hospital was he had hurt his back "one month ago" while lifting a heavy object, and that he could not sleep the prior night. His chief complaint was that his back hurt, and he reported having had sudden pain in his back two days earlier.
Brien testified that he went to the emergency room in August because he realized that Angel was not going to send him to a doctor. He was hurting when he returned from Houma, and he nearly passed out because he was weak from not eating. Brien denied that he had hurt his back while carrying 10-pound bags of shrimp during the Houma trip.
When he was treated by Dr. Taylor on September 4, 2002, Brien told Dr. Taylor that he felt a strain and pain in his lower back at the time of injury, but did not *582 think anything of it. He also stated that the pain worsened the next day, improved a bit over the next several days, but then worsened until he had severe lower back pain.
It was claimed by Brien that he was fired on September 16 because he had seen a doctor after Leon Angel had told him not to see one.[5] Leon Angel countered that he learned that Brien had threatened to turn Angel Constructors in to the Department of Labor if he did not receive extra pay, so he confronted Brien and said that his company would not be held ransom and, regardless, he had no concerns about any violations. Angel recalled that Brien then said he no longer had interest in working for the company. The written dismissal of Brien does not mention this incident, but it states that Angel had not received a medical excuse for Brien's absences since August 26, 2002. We note that on August 10, 2002, O'Neal had written to Brien that he was being given an increase in pay of 50 cents per hour, and in return was asked to have a better attitude toward the company and increased responsibility.
Three days after being fired, Brien was examined by Dr. Goodman. He told Dr. Goodman that he had hurt his back at work on June 24, 2002, had nonetheless continued working that day, but had experienced increased back pain the next morning. After he had some improvement with the passage of eight days, he returned to work. Brien also told Dr. Goodman that after he came back from Houma, he had increased back pain. Brien described his pain to Dr. Goodman as being primarily in his back with bilateral thigh pain.
Leon Angel testified that the first time he heard that Brien was injured was when O'Neal told him that Brien showed up on a Monday morning complaining of an injury which he had received over the weekend and wanting to know if he could go to the emergency room. Pursuant to Angel's instructions, O'Neal wrote a memo on August 26, 2002, about the injury. O'Neal wrote that on two occasions during the prior two weeks, Brien had complained that his back stiffened, but he was able to work through it, then on that Saturday morning, Brien complained that the long drive from Houma had caused his back to stiffen, and later that Saturday, tingling sensations developed in his lower back, and he has had back pain ever since.
Angel Constructors' own report of injury form, which was completed by O'Neal, was dated June 27, 2002. It states that the accident took place on the morning of June 24, and that the employer knew of the injury on that date.
Based upon our review of this record, we cannot conclude that the WCJ was clearly wrong in finding that Brien had sustained a compensable injury on June 24, 2002.
Supplemental Earnings Benefits
Supplemental Earnings Benefits (SEB) are awarded when a work-related injury prevents the employee from earning 90% or more of his pre-injury wages. La. R.S. 23:1221(3)(a). The employee has the initial burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. Banks, supra. "Th[is] analysis is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation law is to be liberally construed in favor of coverage." Daigle v. Sherwin-Williams Co., 545 So.2d 1005, *583 1007 (La.1989). See Seal v. Gaylord Container Corp., 97-0688 (La.12/2/97), 704 So.2d 1161, and Kahlden v. Horseshoe Entertainment, 30,277 (La.App. 2d Cir.2/25/98), 709 So.2d 873.
Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEB or establish the employee's earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. La. R.S. 23:1221(3)(c)(i); Daigle, supra. Actual job placement is not required. Banks, supra.
Appellants contend that the WCJ erred in awarding SEB to Brien. They argue that the WCJ failed to consider Brien's actual wage earning capacity. They also argue that the positions offered with Angel Constructors were within Brien's reasonable geographic area. In examining these arguments, it is helpful to consider the limitations imposed by Brien's physicians, as well as efforts to provide Brien with vocational rehabilitation.
Brien's medical records demonstrate that as early as November 5, 2002, Dr. Goodman limited Brien to light duty work. When Dr. Goodman treated Brien for the last time on June 29, 2004, he released Brien to light-medium to light work on a permanent basis.
The FCE from May of 2003 showed that Brien could work full time in a job having light-medium physical demands. It was noted in the FCE report that based upon Brien's description of the physical demands of his pre-injury job, that job fell into the medium-heavy physical demand level category and he would not be able to return to that line of work. However, it was also noted that his impairment was not severe and it would not prevent him from returning to some form of gainful work. Dr. Goodman remarked on June 6, 2003, that he agreed with the findings of the FCE that Brien could do light-medium work. Based upon the FCE findings, Dr. Gleason believed that Brien could return to work at a light-medium level, but that he had limited transferable skills other than in construction and carpentry.
Gisclair and Associates was hired to provide vocational rehabilitation services to Brien in October of 2002. The file was assigned to Terry Finley, a vocational rehabilitation counselor, to perform a job analysis of Brien's job at the time of his injury. Gisclair and Associates usually begins the vocational rehabilitation services process with a job analysis because the initial goal is to place the injured worker in the same job with his same employer. At the time, Finley sent the file to Jewel Jourdan, a nurse case manager, because the case was not vocationally ready.[6]
In November of 2002, Finley contacted Angel to learn more about Brien's job at the time of injury. The next month, Finley visited the courthouse construction site and spoke with O'Neal, who told Finley that Brien had been working as a carpenter and with drywall. Because Brien had been required to lift up to 100 pounds, Finley thought the job was in the overall very heavy-duty classification. Finley sent the job analysis to Angel for his review, and Angel responded that he would make changes to the job to accommodate Brien. Finley then changed the job demand classification from heavy to light duty based *584 upon Angel's representation that he would allow Brien to perform work in the light duty range.[7]
A job analysis with an overall light duty classification was submitted to Dr. Goodman for his approval as treating physician. Dr. Goodman signed it on December 18, 2002, but added that there was to be no repeated bending, twisting, or lifting over 20 pounds. Angel agreed that the modified job for Brien would comply with these limitations imposed by Dr. Goodman. Nevertheless, when Brien visited Dr. Goodman on January 22, 2003, he told Dr. Goodman that the job description was for a carpenter and drywall worker and was not accurate, and that the job was not light duty. Dr. Goodman agreed that Brien could not return to that type of work. Several days later, Dr. Goodman wrote a letter addressed to whom it may concern that stated he wanted to confirm that Brien was unable to do the modified job because Brien said the job was more than light duty.[8] Finley admitted that he did not know of many light duty construction jobs, and that he had not spoken with Brien. Having moved to a new company, Finley no longer worked on the file after January of 2003.
Tommie Spivey, a new vocational rehabilitation counselor, began working on Brien's file in July of 2003 under the supervision of Bob Gisclair. After meeting with Angel at his office in September of 2003 for a job analysis conference, she completed a job analysis for a modified construction worker.[9] After notifying Brien's attorney, Spivey submitted this job analysis to Dr. Whyte for approval. She submitted it to Dr. Whyte because she thought he was the treating physician at the time; it was not submitted to Dr. Goodman. Dr. Whyte approved the job analysis on November 5, 2003.
Brien's attorney was notified on January 14, 2004, that Dr. Whyte had approved the position at Angel, and that Brien was to report to work in Shreveport on January 30. In a letter dated January 26, 2004, Brien's attorney wrote to the insurer that Brien would not be able to report to the Angel job offered in Shreveport because he did not have a car.
Interestingly, Finley did not know what to make of Spivey's job analysis. He remarked that his job analysis was specific to Brien, whereas what Spivey produced was a generic job analysis for a general construction worker doing light duty work. He added that he would not take a general job analysis to a doctor for approval. Finley thought that Spivey's work came out of the Dictionary of Occupational Titles ("DOT"). Spivey testified that the information for her job analysis basically came from her conversation with Angel, but she also obtained information from looking at the DOT.
For her part, Spivey did not think that Finley's job analysis was an actual job analysis because it was titled as a job quest, and she had never done a job quest before. Gisclair remarked that a job quest is essentially another name for a job analysis.
*585 Once the issue of being unable to travel to Shreveport was raised, the decision was made to implement full vocational rehabilitation services in Mansfield, and the case was transferred to another vocational rehabilitation counselor, Mary Walker, who met with Brien in March of 2004.[10] Walker completed an initial vocational assessment, gave an achievement test, scored the test, prepared the transferable skills, and then met again with Brien to develop a vocational plan.[11] On the achievement test, Brien scored at the high school level in reading and at the 6th grade level in spelling and arithmetic. Brien did not tell Walker that he had a GED, which would have been important to know because it qualified him for jobs involving less manual labor; Walker did not look for those types of jobs. Brien and Walker disagreed about whether Brien should mention his physical limits on job applications.
Limiting her search to the Mansfield area, Walker did not identify any jobs for Brien in the construction field. At the time, Brien had remained in Mansfield before moving back to Houma in 2005. Walker found two jobs in Mansfield. One was a sales position at Ivey Lumber, and the other was a cashier position at Wal-Mart. Drs. Goodman and Whyte both approved the positions. These were the only positions that Walker found for Brien. Walker closed her file in June of 2005.
Brien established that he was unable to earn 90% of his pre-injury wages. The only jobs that defendants were able to find for Brien were the two jobs with Angel Contractors, the Wal-Mart job, and the Ivey Lumber job. Neither one of the latter two positions paid more than $5.45 per hour. Brien was earning $13.00 per hour at the time of his injury.
The first job offered by Angel, which was presumably in Leesville, was ultimately rejected by Dr. Goodman after he initially approved it. The second job was not even presented to Dr. Goodman for approval. Dr. Whyte approved the second job after being presented with a job analysis that Finley did not think was even specific to Brien. Nevertheless, even if the two jobs offered by Angel Contractors were suitable for Brien, the WCJ properly rejected them as being outside of Brien's geographic region.
Brien lacked reliable transportation to drive to and from Shreveport or Leesville, which are both more than 30 miles from Mansfield. He testified that he had a 1992 Bonneville that was not in good working order and was not reliable enough to make the trip on a regular basis. Walker asserted that Brien told her that his car had been repaired and he could frequently make the Shreveport drive. Brien denied saying this. The poor condition of Brien's car was corroborated by his former girlfriend's son, Jesse Hayes, who stated that Brien worked on his mother's Camaro because Brien needed her car running in order to get around. Hayes added that he believed that Brien's own car always had problems.
Walker limited her search to a 30 mile radius of Mansfield because Brien had lived and worked in Mansfield at the time of injury. Walker commonly used a standard 30-35 mile radius unless the worker drove farther to his pre-injury job.[12] Spivey *586 had no opinion about whether Shreveport is outside the geographic region of Mansfield, and she was not aware of Brien's transportation situation.
Furthermore, Brien's actual wage earning capacity was apparent from the record and does not diminish his entitlement to SEB. At the time of his injury, Brien was a 45-year-old Navy veteran who had a GED and who had mostly worked construction-type jobs. He did not have many job options in the Mansfield area, as evidenced by Walker only coming up with two entry-level positions for Brien.
Brien has not remained housebound since leaving employment with Angel Constructors. He returned to Houma in April of 2005. Shortly thereafter, he met a doctor from New Orleans, Dr. William Bertrand, who had a camp in Dulac. Brien would do occasional odd jobs for Dr. Bertrand, such as watching his camp, cutting the grass, and hauling large wood figures belonging to Dr. Bertrand from New Orleans to storage in Houma. Brien also cleaned the figures. In return for his service, Brien was allowed to stay at the camp, and was provided with the use of a 1993 Ford Explorer, gas, and food. Dr. Bertrand gave him approximately $2500 over ten months, but Brien had to give some of this money to others as payment for repairs.
Brien has occasionally hunted squirrels and deer, and ridden on an ATV. He has also gone shrimping and picked up pecans. Brien admits that he has worked on his own car and his girlfriend's car, but added that it did not bother him if he only did it occasionally. He has been able to cut two acres of grass using a riding lawn mower and his sister's yard with a self-propelled push mower because he worked at his own pace. Brien allows that he can bend over, but that he cannot do it constantly.
In October of 2004, Brien attempted to get a job walking horses for a trainer at Louisiana Downs. Brien stated that he attempted to do it for one day, which was captured on video by investigators hired by defendants, but he did not get the job because he was unable to do it. Brien also supervised the building of a frame for a slab for his sister's trailer over a period of four days. During this supervision, Brien moved a few pieces of lumber, and occasionally hammered and used a shovel.
Brien is not crippled, but primarily because of his documented physical and intelligence limits, he has been unable to find work paying 90% or more of his pre-injury wages. The WCJ accounted for Brien's actual wage earning capacity when factoring the amount of SEB to which Brien is entitled. Based upon this record, we cannot conclude that the WCJ was manifestly erroneous in finding that Brien was entitled to SEB in the amount of $872.47 per month from November 16, 2004, to October 16, 2006.
False Statements and Misrepresentations
Appellants next complain that the WCJ erred in denying their claim that Brien had violated La. R.S. 23:1208, which provides, in part:
A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
* * * * *
E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
*587 This statute authorizes forfeiture of benefits upon proof that (1) there is a false statement or representation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or defeating any benefit or payment. Resweber v. Haroil Construction Co., 94-2708 (La.9/05/95), 660 So.2d 7.
Whether a workers' compensation claimant has forfeited his right to benefits by making a false statement for the purpose of obtaining benefits is a question of fact that will not be disturbed on appeal absent manifest error. Bossier Electric v. Cubley, 35,852 (La.App. 2d Cir.6/14/02), 821 So.2d 685. Statutory forfeiture must be strictly construed. Wise v. J.E. Merit Constructors, Inc., 97-0684 (La.1/21/98), 707 So.2d 1214.
Appellants introduced several video tapes documenting Brien's activities in December of 2002, February and August of 2003, and June and October of 2004. Among the activities shown on the tapes are Brien walking and bending over, washing his car, working on his car, entering and exiting his car and businesses, and walking horses. The adjuster sent some of the video footage to Dr. Goodman for his review.
After comparing Brien's deposition and trial testimony to the video surveillance, photos, and testimony of witnesses, the WCJ noted that he had concerns about Brien's representations about his physical limits, and that it was a very difficult and close decision. Nevertheless, the court found that Brien's statements that were contradicted by the video surveillance were inconsequential. Moreover, the court noted that even after Dr. Goodman viewed some of the video and found inconsistencies between the activities depicted on the videos and how Brien had presented himself when being treated, Dr. Goodman still did not think that Brien could perform his old job, and he still limited Brien to light duty work based upon his objective findings and Brien's subjective complaints of pain. The WCJ was not manifestly erroneous in finding that Brien had not violated La. R.S. 23:1208.
Penalty and Attorney Fees
Appellants assert that the WCJ erred in assessing a penalty of $2,000.00 and awarding attorney fees of $7,500.00 because they stopped paying benefits on November 16, 2004. Brien has answered the appeal, seeking an increase in the amount assessed as a penalty and the amount awarded as attorney fees, as well as attorney fees for responding to this appeal.
Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Young v. Christus Schumpert Medical Center, 39,593 (La.App. 2d Cir.5/11/05), 902 So.2d 1180; Lee v. Schumpert, 36,733 (La.App. 2d Cir.1/29/03), 836 So.2d 1214. Nevertheless, a WCJ has great discretion in awarding or denying penalties and attorney fees. Nowlin v. Breck Const. Co., 30,622 (La. App. 2d Cir.6/24/98), 715 So.2d 112.
In their brief to this court, appellants argue that "[p]ursuant to La. R.S. 23:1201.2, attorney fees and penalties are not owed when the claim is reasonably controverted." That statute, which was repealed in 2003, provided for an assessment of attorney fees, but not a penalty, when an employer or insurer discontinued payment of claims due and the discontinuance was arbitrary, capricious, or without probable cause. The substance of La. R.S. 23:1201.2 now appears in La. R.S. 23:1201(I). Subsection (I), which was added in 2003 and thus in effect at the time the wage benefits were discontinued, states:
Any employer or insurer who at any time discontinues payment of claims due *588 and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims. . . .
The difference between "arbitrary, capricious, or without probable cause" and "reasonably controverted" in the context of La. R.S. 23:1201 has been explained:
Unreasonably controverting a claim . . . requires action of a less egregious nature than that required for arbitrary and capricious behavior. Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation. Stated another way, such behavior arises from unrestrained exercise of the will or personal preference or lacks a predictable pattern.
Brown v. Texas-LA Cartage Inc., 98-1063 (La.12/01/98), 721 So.2d 885, 890 (citations omitted).
Brien's file was transferred to adjuster Philip Moory in November of 2004. Moory made the decision to terminate Brien's indemnity benefits because he thought Brien could return to his pre-injury job and Angel had offered Brien a supervisor's position in Leesville in 2003 and what Moory termed a "doing nothing" job in 2004. Moory did not speak with any vocational rehabilitation counselor before terminating the benefits.
Most notably, Moory did not agree that Brien had been restricted from returning to the same job that he had before he was hurt. When asked what his understanding of Brien's restriction was, Moory replied that he thought Brien was "probably restricted in lifting things in excess of 2 or 300 pounds." Moory added that he based his understanding upon a physical assessment of Brien's size and stature. Leaving no doubt as to his opinion about Brien's restrictions, Moory stated that Brien could lift enough to do his old job and could "definitely" do his old job. This is contradicted by the medical evidence. Without question, the decision to terminate the indemnity benefits made by Moory was arbitrary, capricious, and without probable cause. The WCJ did not abuse his discretion in deciding to assess a penalty and award attorney fees.
Brien has answered the appeal seeking a modification of the judgment to increase the penalty and attorney fees awarded by the trial court, as well as an award of attorney fees for responding to this appeal. We discern no abuse of the trial court's discretion in setting the penalty at $2,000.00 and attorney fees at $7,500.00. However, we award additional attorney fees of $1,000.00 to Brien for successfully defending this appeal.

CONCLUSION
With appellants to bear the costs of this appeal, the judgment is AFFIRMED. Additional attorney fees of $1,000.00 are awarded to claimant.
NOTES
[1] It was noted that Brien had an appointment with another physician later in the month, but Brien felt that he could not wait because of the pain and discomfort in his lower back.
[2] Dr. Goodman noted that an MRI showed multi-level degenerative disc disease without significant stenosis or nerve root involvement, and possible acute disc protrusion at L3-4.
[3] The records show that Brien spent two hours on June 27 doing a hardware plan check, and one hour on June 28 working on his trailer.
[4] Brien claimed that Leon Angel told him that he would be paid for the entire week if he did not go to the doctor.
[5] September 16 was the date of his MRI.
[6] Finley explained that the nurse case manager gets medical care for a claimant to bring him to a point where he can begin vocational rehabilitation.
[7] Finley did not see this modified job performed.
[8] Angel testified that he told the rehabilitation counselors that he would provide the necessary special conditions, including having a laborer work with Brien so that he would not strain himself.
[9] Spivey never spoke with Brien or knew that he had been fired from Angel Constructors. She also did not visit the construction site with Angel.
[10] She was the only counselor to have contact with Brien.
[11] Gisclair explained that this sort of testing was unnecessary until it became clear that Brien was not going to return to Angel Constructors.
[12] Walker was also aware that the most recent job offer with Angel Constructors had been turned down because it was too far way.