991 So.2d 102 (2008)
Arthur AMOS, Plaintiff-Appellant
v.
OUACHITA PARISH POLICE JURY, Defendant-Appellee.
No. 43,289-WCA.
Court of Appeal of Louisiana, Second Circuit.
June 18, 2008.
Judgment rendered June 18, 2008.
*104 Street and Street, by C. Daniel Street, Monroe, for Appellant, Arthur Amos.
Hayes, Harkey, Smith & Cascio, by John B. Saye, Monroe, for Appellees, Ouachita Parish Police Jury and Ouachita Parish Fire Department.
Before BROWN, STEWART, and LOLLEY, JJ.
BROWN, Chief Judge.
From the rejection of his claim for benefits under the Heart and Lung Act, La. R.S. 33:2581, Arthur Amos, a former fireman in Ouachita Parish, has appealed. For the reasons set forth below, we reverse the judgment of the workers' compensation judge ("WCJ") and remand the matter to the WCJ for further proceedings consistent with this opinion.

Procedural History
Claimant, Arthur Amos, was employed as a fireman with the Ouachita Parish Fire Department from February 29, 1988, until November 26, 2002, when he suffered a disabling stroke. Claimant filed a claim seeking workers' compensation benefits from his employer, the Ouachita Parish Police Jury, asserting disability caused by the stroke and "black lung." The police jury paid weekly compensation benefits in the amount of $416 to claimant until January 16, 2005, which is when the WCJ determined that claimant's stroke and resulting disability were not employment related. A final judgment was signed and neither party appealed therefrom.
*105 Thereafter, on September 14, 2005, claimant filed a second claim alleging entitlement to benefits under the Heart and Lung Act, La. R.S. 33:2581, for disabling lung and heart conditions allegedly related to his employment with the fire department. The police jury filed an exception of res judicata which was overruled by the WCJ. Writs filed with this court and the supreme court were denied.
A hearing was held on March 14, 2007, and May 17, 2007. The WCJ found that the evidence showed manifestation of an infirmity in claimant's lungs prior to his first five years of employment with the fire department, thus precluding application of the presumption of causation provided by La. R.S. 33:2581. Therefore, the WCJ concluded that claimant was required to prove that his condition was caused by and resulted from the nature of the work that he performed. After reviewing the medical evidence from claimant's treating and evaluating physicians, the WCJ found that claimant did not establish a causal connection between his employment and his lung condition. From the dismissal of his claim for indemnity and medical benefits, claimant has appealed.

Discussion

Applicability of Presumption Afforded by La. R.S. 33:2581
In his first assignment of error, claimant argues that the WCJ erred in failing to find that he was entitled to the presumption of causation set forth in La. R.S. 33:2581.
The Heart and Lung Act, La. R.S. 33:2581, provides that:
Any disease or infirmity of the heart or lungs which develops during a period of employment in the classified fire service in the state of Louisiana shall be classified as a disease or infirmity connected with employment. The employee affected, or his survivors, shall be entitled to all rights and benefits as granted by the laws of the state of Louisiana to which one suffering an occupational disease is entitled as service connected in the line of duty, regardless of whether the fireman is on duty at the time he is stricken with the disease or infirmity. Such disease or infirmity shall be presumed, prima facie, to have developed during employment and shall be presumed, prima facie, to have been caused by or to have resulted from the nature of the work performed whenever same is manifested at any time after the first five years of employment.
As the courts of this state have recognized, it is generally accepted that a fireman, as a result of the stress and strain of his work, is predisposed to vascular disease, and our legislature has acknowledged this fact in enacting La. R.S. 33:2581. Coats v. City of Bossier City, 31,164 (La. App. 2d Cir.10/30/98), 720 So.2d 1283, writ denied, 99-0019 (La.02/12/99), 738 So.2d 581; Vallelungo v. City of New Orleans, 95-0264 (La.App. 4th Cir.05/01/96), 673 So.2d 1292. La. R.S. 33:2581 expressly covers any disease or infirmity of the heart or lungs. City of Jennings v. Deshotel, 99-1232 (La.App. 3d Cir.02/02/00), 758 So.2d 269, writ denied, 00-0663 (La.04/20/00), 760 So.2d 1157.
If applicable, the statute's provisions actually afford a claimant two presumptions: (1) that his heart or lung disease or infirmity developed during employment; and (2) that the disease or infirmity was caused by or resulted from the nature of his employment. Coats, supra; Rothell v. City of Shreveport, 626 So.2d 763 (La.App. 2d Cir.1993), writ denied, 93-3191 (La.02/11/94), 634 So.2d 379; Vincent v. City of New Orleans, 326 So.2d 401 (La.App. 4th Cir.1975), writ denied, 329 So.2d 760 (La. 1976).
*106 The WCJ found that the presumptions did not apply to claimant because a lung infirmity first manifested itself within claimant's first five years of employment. The WCJ relied on the medical histories related by claimant to his physicians. Specifically, on March 5, 2004, claimant was examined by Dr. Glenn Gomes of the Oschner Clinic Foundation. In his notes, Dr. Gomes recorded, "The patient states that he has no prior history of asthma, pneumonia, emphysema or tuberculosis as a child. He states he first began having problems with his breathing in about 1990. This was after he quit smoking cigarettes, and he relates his problems with breathing with smoke exposure. He states that he has had an occasional cough now for years." The WCJ also took note of the history given by claimant to Dr. Scott Irby, considered by claimant to be his current treating physician. In a report dated June 24, 2004, Dr. Irby observed that claimant gave a history of beginning to experience problems with wheezing and shortness of breath in 1990 or 1992 and that he has been on and off inhalers since that time.
In addition to the above medical histories, claimant testified that his breathing problems and cough began in 1991 and that both conditions got worse over time. Claimant's employment as a fireman began in 1988, which is less than five years before the first manifestation of his symptoms. In light of the above evidence, we cannot say that the WCJ erred in finding that the presumptions afforded by La. R.S. 33:2581 were inapplicable in this case. This does not end the inquiry, however.

Causal Connection Between Employment and Lung Condition
Although finding that the evidence showed manifestation of an infirmity in claimant's lungs within his first five years of employment with the fire department, the WCJ concluded that claimant failed to establish that his lung condition was caused by and/or resulted from the nature of his work. Claimant contends, however, that the medical evidence overwhelmingly shows a causal connection between his employment and his lung condition.
Most of the jurisprudence applying La. R.S. 33:2581 involves claimants who, because of the time frames in which their diseases or conditions developed, were afforded the benefit of the statutory presumptions. Because we agree with the trial court that the statutory presumptions are not applicable to this claimant, this line of cases does not offer this court much guidance in analyzing whether claimant established the causal connection necessary for him to be entitled to benefits under the Heart and Lung Statute. In Savoie v. Fire Protection District #1, St. Landry Parish, 483 So.2d 1041 (La.App. 3d Cir.1986), writ denied, 485 So.2d 54 (La.1986), however, the court was presented with a claimant who, because he had not been employed with the fire department a full five years when he developed pneumonia and a lung abscess, was not entitled to the benefit of the statutory presumptions. The Third Circuit observed that La. R.S. 33:2581 does not expressly set forth the burden of establishing disability and its causal relation with employment for those without the benefit of the statutory presumptions. Citing Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320 (La.1985), the court explained that "as in other civil suits the employee in a worker compensation proceeding initially has the burden of establishing his disability and its causal relation with the employment accident by a preponderance of the evidence." Savoie, 483 So.2d at 1044. As noted by this court in Jones v. A T & T, 28,059 (La.App. 2d *107 Cir.02/28/96), 669 So.2d 696, just as with an employment accident, the claimant who asserts an occupational disease bears the burden of proving by a preponderance of evidence that an employment-related affliction caused the disability.
However, neither the Heart and Lung Act nor the cases interpreting its application suggest that a claimant must prove that his employment was the only cause of the development of a disease or infirmity. Vallelungo, supra. Instead, it is sufficient under the act to show that the employment is a contributing, accelerating, or aggravating factor. Rothell, supra; Vallelungo, supra.
Therefore, we must examine the evidence to determine whether the WCJ erred in finding that claimant did not bear his burden of proving by a preponderance that his lung disability was causally connected to his employment with the fire department.

Claimant, Arthur Amos
Claimant, Arthur Amos, testified that he worked as a full-time fireman from February 29, 1988, until November 26, 2002, achieving the rank of captain before becoming disabled by a non-work-related stroke. Claimant stated that his work included responding to calls, putting out fires, and working chemical spills. As a fireman, he was exposed to smoke and chemicals. In fact, claimant was on the crew that responded to several chemical fires, including the catastrophic fire and explosion in Sterlington in 1991. Amos testified his breathing problems and a cough started immediately after that and that his condition worsened over time. After his stroke in November 2002, his breathing problems increased significantly.

Dr. Kerry Anders, family practitioner
The voluminous medical records of claimant's family practitioner, Dr. Kerry Anders, were introduced into evidence. A brief perusal of these records shows that Amos sought treatment from Dr. Anders on the following dates with the listed complaints:
12-09-96: congestion, cough, sinus drainage
04-21-98: bronchitis
08-02-00: persistent cough and throat clearing
09-08-00: cough
10-05-01: cough and remote possible exposure to asbestosis; request second opinion from pulmonologist
02-21-02: cough
02-22-04: complaints of shortness of breath noted for two years

Dr. Robert Sarama, pulmonologist
Dr. Robert Sarama is the pulmonologist to whom Dr. Anders referred claimant in October 2001. Dr. Sarama first saw claimant on October 8, 2001. Claimant's chief complaint was chronic cough. At that time, Amos, a firefighter, related a history of being exposed to smoke on occasion, but he felt that his cough was triggered by spraying for mosquitoes during the encephalitis outbreak. Amos also indicated that he had been a smoker but had stopped when diagnosed with throat cancer. Dr. Sarama's impression was that Amos's cough was secondary to inhaling fumes from spraying or from a fire; at that time, they weren't sure what they were dealing with. Dr. Sarama prescribed a steroid inhaler on that date.
Claimant returned to Dr. Sarama on October 30, 2001, still coughing, but with an improved forced vital capacity. His medication was changed to an Advair inhaler, which is a combination of two medications, a bronchodilator and a long-acting steroid. In his notes, Dr. Sarama observed, "I truly suspect he had smoke *108 inhalation. We will see if this clears him up. If it does, I will give him a prescription for such. If it does not clear him, it may be very difficult to clear."
Dr. Sarama saw claimant one more time prior to his stroke. On January 29, 2002, claimant still had a cough, but had stopped his Advair, so Dr. Sarama upped the dosage and told claimant he had to take his medication on a regular basis. Thereafter, claimant missed several appointments and Dr. Sarama wrote a letter to Dr. Anders, Amos's family practitioner, indicating his unwillingness to treat claimant in the future except upon referral.
Claimant returned to Dr. Sarama on March 3, 2003, complaining of increased shortness of breath and wheezing. Dr. Sarama noted that Amos had significant health changes. Since Dr. Sarama last saw Amos, he had a brain tumor removed and a stroke that left Amos partially paralyzed on his right side. At that time Dr. Sarama felt that because of the disability caused by the stroke, claimant would no longer be able to fight fires. Dr. Sarama also noted that claimant had reactive airway disease and lung capacities which were half of what they had been prior to the stroke. Amos was taking Toprol, a beta blocker, to maintain his blood pressure. According to Dr. Sarama, for anyone with reactive airway disease or asthma, a medication such as Toprol causes breathing problems to worsen. Dr. Sarama stated that claimant had multiple problems with pulmonary disease so he was bound to have reactive airway disease. Dr. Sarama noted that at that time, he would inquire of Dr. Anders whether Amos could be switched to a non-beta blocker for his blood pressure because Dr. Sarama felt that the wheezing he heard was asthma, which was being induced by the Toprol. Dr. Sarama prescribed an Advair 100/50 inhaler.
Amos returned on March 25, 2003, with an improved capacity. To Dr. Sarama, this meant that claimant did have asthma and that the Toprol was contributing to the asthmatic condition. Dr. Sarama made another note to consult with Dr. Anders about switching claimant's medication. On May 6, 2003, claimant returned to Dr. Sarama, still weak and having episodes. Dr. Sarama increased the Advair dosage. On July 29, 2003, Dr. Sarama felt that Amos was not doing as well as the doctor would have liked. Claimant was waking up with attacks of shortness of breath. Dr. Sarama's impression was reactive airway disease. Atrovent was prescribed at that time. Claimant returned on September 2, 2003, still wheezing and short of breath. Dr. Sarama explained that claimant's breathing was probably maximized because of limitations caused by other conditions. Dr. Sarama testified that claimant's shortness of breath could be related to obstructive lung disease, his medication (Toprol), or because of a diastolic dysfunction. Dr. Sarama stated, "There's no way to sit there quantifiably with any degree of certainty and say which variable is causing all the problems. I mean, I can't do that."
Thereafter, claimant returned to Dr. Sarama with similar complaints on September 30, November 4, and December 9, 2003, and March 9, and June 9, 2004. Claimant continued the Toprol and Dr. Sarama noted each visit that because of this medication, Amos's asthma would never be completely controlled, but that he understood the risks involved in changing claimant's blood pressure medication.
When asked whether he would relate claimant's breathing problems to his employment with the fire department, Dr. Sarama was unwilling to do so because the significant decrease in Amos's lung capacities came after his stroke and his *109 placement on Toprol. According to Dr. Sarama, Amos's asthma was not caused by firefighting because claimant never came in with significant smoke inhalation/fire exposure which required hospitalization. Dr. Sarama opined that prior to claimant's stroke, his breathing condition would not have disabled him from work as a fireman. Dr. Sarama noted that claimant had reactive airway disease when he first saw Dr. Sarama in the fall/winter of 2001-2002. Dr. Sarama testified that he did not know whether this was related to Amos's work as a fireman. Because he didn't see claimant again until three months after his stroke, when there was a significant difference in his breathing capacities, Dr. Sarama feels that the decrease is attributable to the medication and/or the stroke. Dr. Sarama conceded that with the readings claimant had on June 9, 2004, he would not recommend that Amos return to firefighting.

Dr. Scott Irby, internist specializing in pulmonology
Dr. Irby first saw claimant for purposes of an independent medical examination on June 24, 2004. On that date, Amos's primary complaint was shortness of breath. Dr. Irby had Dr. Sarama's records and notes, as well as records and notes from Drs. Potts and Greer and Glenwood Medical Center. Claimant's medical history included being on inhalers for 10-12 years for wheezing and shortness of breath. A physical exam revealed claimant's obvious neurologic deficit and a pulmonary exam (which included a complete pulmonary function test and a chest x-ray) showed that Amos had very poor air flow in general.
Dr. Irby observed that claimant was instantly disabled when he suffered the CNS aneurysmal rupture, and that claimant is currently disabled from physical labor and probably other types of work because of the seizure medication he has to take. Dr. Irby felt that claimant's lungs were not affected by the aneurysmal rupture and subsequent stroke because Amos's medical records indicated that he had significant underlying lung problems for years prior to the aneurysm. In further support of his opinion, Dr. Irby relied upon his physical examination of claimant and the results from the pulmonary function test he conducted.
When asked whether he concurred in the opinion of Dr. Glenn Gomes, a pulmonologist who conducted an independent medical examination of claimant upon the request of the Firefighters' Retirement Disability System, that all of claimant's lung problems were due to the CNS leaky aneurysm surgery and aftereffects, Dr. Irby noted that he completely disagreed with Dr. Gomes. According to Dr. Irby, a person does not get asthma or emphysema from having brain surgery, at least not immediately. Furthermore, Dr. Irby opined that the Toprol could certainly have made claimant's wheezing worse but it was not a cause. Dr. Irby pointed out that Dr. Sarama had already treated claimant for asthma before his stroke while claimant was still working as a fireman.
Dr. Irby saw claimant three more times in 2004. On July 14, 2004, claimant had stopped taking Toprol at Dr. Sarama's suggestion and felt a little better, and Dr. Irby got claimant a home breathing machine for his medications. Claimant then returned to Dr. Irby on October 6, 2004, still complaining of shortness of breath. At that time, Dr. Irby prescribed prednisone. On November 3, 2004, Dr. Irby repeated the pulmonary function test and claimant's results improved by 40%. This improvement Dr. Irby attributed to the steroids, but because Amos didn't like the way the prednisone affected him (weight *110 gain, insomnia, nervousness), this medication was discontinued.
Dr. Irby next saw claimant on March 4, 2007. At that time, Amos was back on the Toprol. Dr. Irby pointed out that if Dr. Sarama's notes are accurate, while working as a fireman, claimant had a respiratory disease and/or asthma. Had Dr. Irby seen claimant at that time, because of the emphysema, Dr. Irby would have put Amos on disability because one should not be a fireman with moderately severe emphysema. Dr. Irby pointed out that asthma, allowed to continue for years, affects the lungs, often causing emphysema.
When asked the cause of claimant's emphysema, Dr. Irby stated that there could have been more than one cause: Amos "ate smoke" (fought fires), smoked, and had asthma. Dr. Irby emphasized that asthma/emphysema is related to the activities that firefighters perform during the course of their employment. According to Dr. Irby, claimant's prognosis is very poor because of his emphysema, independent of his other medical problems. Dr. Irby reiterated that he cannot separate out the cause of claimant's shortness of breath-both his firefighting activities and history of smoking were contributions. Furthermore, claimant's activities as a firefighter and the Toprol combined to make his asthma worse.

Dr. Glenn Gomes, pulmonologist
Dr. Glenn Gomes conducted an independent medical exam of claimant on March 10, 2004, at the Ochsner Clinic of Baton Rouge at the request of the Firefighters' Retirement System. Dr. Gomes noted a history that included problems with claimant's breathing beginning in 1990 after he quit smoking. Dr. Gomes observed that Amos related his breathing problems to smoke exposure and pointed out that he has had an occasional cough for years as well. Dr. Gomes's assessment was mild to moderate impairment of lung function primarily due to claimant's neurologic problems. In his comments, Dr. Gomes observed that Amos has a pattern of restrictive lung disease with a decrease in his maximum voluntary ventilation, which is frequently seen in patients with neuromuscular disease such as a stroke. Specifically, Dr. Gomes opined that "While he has had some symptomatic improvement with bronchodilator therapy, I do not believe that asthma, due to smoke inhalation, is this gentleman's primary problem. I do not believe that his disability is a direct result of his result of his work as a firefighter and fire captain." Dr. Gomes felt that claimant's disabling stroke was a permanent medical problem which has completely and totally disabled him. According to Dr. Gomes, the present manifestations of claimant's pulmonary symptoms are a result of consequences from his stroke. Dr. Gomes based his opinion on pulmonary function studies which he felt were more consistent with a restrictive impairment from neurologic disease.

Dr. Jason Landry, pulmonologist
Dr. Jason Landry evaluated claimant at the request of the Firefighters' Retirement System on November 17, 2004. Dr. Landry noted that claimant's reported history included significant occupational smoke exposure. Dr. Landry also observed that Amos had suffered a debilitating stroke in 2002 and has been unable to work since that time. However, claimant further contended that he was disabled from respiratory dysfunction which predates his stroke-related symptoms. Dr. Landry noted that claimant had been examined by two doctors (Drs. Irby and Gomes) whose evaluations differed in that their pulmonary function data were inconsistent and that claimant was referred to him for "a third and hopefully final opinion for the sake of clarification."
*111 Dr. Landry found that a significant component of claimant's dyspnea was related to anxiety, "though he probably does have some degree of airway inflammation related to various irritant exposures in the past including cigarette smoke, but by no means exempting occupational exposure from the equation.... Although Mr. Amos very likely has some component of occupational-associated lung disease, it is my overall impression that this is not the most limiting issue in terms of his respiratory function. This is ... something that will be almost impossible to conclusively prove or disprove, ..."
Proof by a preponderance of the evidence has been attained when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. Hebert v. Rapides Parish Police Jury, 06-2001 (La.04/11/07), 974 So.2d 635; Foley v. Sportran, City of Shreveport, 40,624 (La.App. 2d Cir.05/17/06), 930 So.2d 368; Brown v. Ruskin Manufacturing Co., 33,015 (La.App. 2d Cir.04/05/00), 756 So.2d 667. Having reviewed the record in its entirety, focusing on the above medical records and testimony, we find that the WCJ erred in failing to find that claimant established, more probably than not, a causal connection between his pulmonary condition and his employment. As noted above, Amos was not required to establish that his employment with the fire department was the sole cause of his lung disease; his burden was met by showing that his employment contributed to, accelerated or aggravated his condition. Amos's medical records, which reflect consistent complaints of wheezing, shortness of breath, and coughing dating back to the early 90s, clearly establish a causal connection between his lung disease and his employment. All of the doctors, with the exception of Dr. Gomes, who felt that claimant's present lung disability was related solely to his stroke, opined that there were multiple causes for claimant's lung problems, including his past history of smoking, employment with the fire department, and use of Toprol to monitor his blood pressure after the stroke. The WCJ erred in concluding otherwise.

Entitlement to Benefits
The Heart and Lung Statute, which provides for a service-related occupational injury, although not specifically incorporated within the Louisiana Workers' Compensation Act, La. R.S. 23:1021 et seq., is applicable to workers' compensation cases. Coats v. City of Bossier City, supra; McKenzie v. City of Bossier City, 585 So.2d 1229 (La.App. 2d Cir.1991); Deshotel, supra. Once a disease or condition covered by La. R.S. 33:2581 is found to exist, the applicability of the workers' compensation provisions is resolved and questions attendant to compensation are then decided pursuant to La. R.S. 23:1021 et seq. Coats v. City of Bossier City, supra; Deshotel, supra; Meche v. City of Crowley Fire Department, 96-577 (La. App. 3d Cir.02/12/97), 688 So.2d 697, writ denied, 97-0632 (La.04/25/97), 692 So.2d 1088.
Once an employee has established the existence of an occupational disease, for his illness to be compensable, he must further establish that the illness is disabling. Coats v. AT & T Company, 95-2670 (La.10/25/96), 681 So.2d 1243; Miller v. Roger Miller Sand, Inc., 94-1151 (La.11/30/94), 646 So.2d 330; Collins v. General Motors Corp., 31,782 (La.App. 2d Cir.03/31/99), 736 So.2d 947.
Complicating this case is the fact that claimant suffered a debilitating stroke on November 26, 2002. It is undisputed that the stroke was an unrelated medical event which worsened Amos's condition and rendered him completely and totally disabled. *112 See Miller, supra. However, the mere fact that the stroke, and not his lung disease, rendered claimant totally disabled does not negate the fact that the occupational disease has left Amos with some form or degree of disability.
In Miller, supra, the plaintiff tore his rotator cuff in a work-related accident, then suffered a non-work-related stroke which worsened his condition and totally disabled him. The supreme court observed that while the employer was not required to pay for the increased disability caused by the plaintiff's subsequent non-work-related stroke, it was required to pay for the disability caused by his work-related fall. Id. at 334-335. The court held that "[I]n order to determine if the plaintiff is entitled to continuing disability payments, we must determine the extent of his disability caused by the work-related fall, giving no consideration to any additional disability caused by the stroke." Id. at 335.
In the instant case, both Drs. Irby and Sarama testified that, with his current readings from pulmonary function tests, claimant cannot return to his employment as a firefighter. In fact, Dr. Irby stated that had he seen claimant prior to his stroke, he would have put him on disability at that time because Amos's medical records indicated the presence of moderately severe emphysema. According to Dr. Irby, claimant's prognosis is very poor because of his emphysema, independent of his other medical problems. In light of the uncontradicted medical testimony about the present condition of claimant's lungs, we find that he has established that he is partially and permanently disabled solely as a result of his lung disease. Claimant is entitled to recover related medical bills and expenses.
Furthermore, La. R.S. 23:1221(4)(p) provides that claimant, based upon the serious and permanent impairment of his respiratory system, may be entitled to permanent partial disability benefits not to exceed 66 2/3% of his wages for a period not to exceed 100 weeks. However, La. R.S. 23:1221(4)(q) requires that we remand this matter to the WCJ for the taking of additional evidence to establish the percentage of the loss of the physical function of claimant's respiratory system as established in the American Medical Association's "Guides to the Evaluation of Permanent Impairment." See, e.g., Lanoue v. All Star Chevrolet, 03-0012 (La.App. 1st Cir.11/07/03), 867 So.2d 755; Gibson v. Lake Charles Ice Pirates, 00-1608 (La. App. 3d Cir.06/06/01), 788 So.2d 720, writ denied, 01-2004 (La.10/26/01), 799 So.2d 1155.

Penalties and Attorney Fees
Claimant asks this court to award penalties and attorney fees for defendant's discontinuance of indemnity benefits and failure to provide medical benefits for his lung condition.
Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Brien v. Leon Angel Constructors, Inc., 42,904 (La.App. 2d Cir.03/12/08), 978 So.2d 576; Young v. Christus Schumpert Medical Center, 39,593 (La.App. 2d Cir.05/11/05), 902 So.2d 1180.
La. R.S. 23:1201(I) provides in part that:
An employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed $8,000 and a reasonable attorney fee for the prosecution and collection of such claims.
*113 La. R.S. 23:1203 requires an employer to provide all reasonable and necessary medical treatment to an employee who sustains a work-related injury. Terral v. Justiss Oil Co., Inc., 07-1014 (La. App. 3d Cir.03/05/08), 979 So.2d 589. La. R.S. 23:1201(F) provides for the imposition of penalties and attorney fees when an employer fails to fulfill this obligation. Id. However, the medical treatment must be causally related to the work-related injury and it must be appropriate. Id.; Fritz v. Home Furniture-Lafayette, 95-1705 (La.App. 3d Cir.07/24/96), 677 So.2d 1132.
Whether a refusal to pay is arbitrary, capricious, or without probable cause depends primarily on the facts known to the employer or insurer at the time of its action. Brantley v. Delta Ridge Implement, Inc., 41,190 (La.App. 2d Cir.06/28/06), 935 So.2d 308; Freeman v. Triad Builders, 39,657 (La.App. 2d Cir.05/11/05), 902 So.2d 1220, writ denied, 05-1562 (La.12/16/05), 917 So.2d 1118. If there is conflicting evidence, an employer is not arbitrary or capricious in reaching its decision to deny or terminate benefits. Id.
In the instant case, an award of penalties and attorney fees pursuant to La. R.S. 23:1201(I) is not warranted. After the WCJ found that Amos was not entitled to compensation benefits for a heart-related illness (his stroke), defendant terminated benefits on January 10, 2005. This discontinuation was neither arbitrary, capricious, nor without probable cause inasmuch as defendant ceased paying indemnity benefits only after the WCJ ruled that claimant's stroke was not causally connected to his employment with the fire department. We likewise find no basis for an award of penalties and attorney fees under La. R.S. 23:1201(F). While we agree that claimant's lung disability was work-related, under the circumstances of this case, it was not unreasonable for defendant to question its connection to claimant's employment.

Conclusion
For the reasons set forth above, the judgment of the workers' compensation judge is REVERSED and the matter is REMANDED for further proceedings consistent with this opinion. Costs assessed to the Ouachita Parish Police Jury in accordance with law.